# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| THE MRS. FIELDS BRAND, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 12201-CB |
| | ) | |
| INTERBAKE FOODS LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted:  March 2, 2017
Date Decided:  June 26, 2017

David A. Jenkins and Robert K. Beste III, SMITH KATZENSTEIN & JENKINS LLP, Wilmington, Delaware; Bijan Amini and Avery Samet, STORCH AMINI PC, New York, New York; *Attorneys for Plaintiff*.

Chad S. C. Stover and Kevin G. Collins, BARNES & THORNBURG LLP, Wilmington, Delaware; Damon R. Leichty and Alice J. Springer, BARNES & THORNBURG LLP, South Bend, Indiana; *Attorneys for Defendant*.

**BOUCHARD, C.**

In March 2012, Mrs. Fields Brand, Inc. entered into a Trademark License Agreement that granted Interbake Foods LLC an exclusive license to manufacture Mrs. Fields-branded cookies for sale in certain retail store channels. The License Agreement has an initial term of five years that ends on December 31, 2017.

In April 2016, after the relationship between the parties had deteriorated, Interbake notified Mrs. Fields that it was terminating the license early, which prompted Mrs. Fields to initiate litigation and seek a declaration that Interbake's purported termination was invalid. For the past fourteen months, Interbake has continued to operate the licensed business under a standstill order, but the litigation quickly escalated, with each side asserting multiple contractual claims for damages and other relief against the other.

In this post-trial decision, I conclude that Interbake's purported termination of the License Agreement was invalid and that the license thus remains in place. I further conclude that both parties have failed to establish an entitlement to damages or other relief based on any of the numerous theories they advanced.

## I.    BACKGROUND

The facts recited in this opinion are my findings based on over 700 trial exhibits, live and video testimony from a six-day trial in which sixteen fact and three expert witnesses testified, and deposition testimony. I accord the evidence the weight and credibility I find it deserves.

## A. The Parties

Founded in 1977, plaintiff The Mrs. Fields Brand, Inc. ("Mrs. Fields") is a Delaware corporation headquartered in Broomfield, Colorado. Mrs. Fields operates multiple business lines, including: (1) franchising stores that serve fresh-baked cookies; (2) licensing the Mrs. Fields trademark and recipes to make and sell shelf-stable cookies for sale in retail stores like grocery, drug, and convenience stores; (3) making online and catalogue-based gift sales directly to consumers; and (4) producing confections and other products.[1] Mrs. Fields is owned and managed by Famous Brands International ("Famous Brands"), a portfolio company of Z Capital Partners, LLC ("Z Capital").

Defendant Interbake Foods LLC ("Interbake") is a Delaware limited liability company headquartered in Richmond, Virginia. Interbake is controlled by Weston Foods US, Inc., ("Weston Foods"), which is itself controlled by George Weston Limited ("George Weston"). Interbake operates as Weston Foods' biscuit division, and provides products through four business segments: retail private brands, Girl Scout Cookies, dairy, and food service.[2]

---

[1] Tr. 1279 (Lyman).

[2] Tr. 224-25 (Gormley).

## B. Mrs. Fields' Branded Retail Business Before Interbake

In 1999, Mrs. Fields granted a company called Shadewell Grove a license to produce and market a shelf-stable cookie in retail channels.[3] Shadewell ramped up distribution quickly but unprofitably through heavy use of slotting fees and trade spend.[4] Slotting fees are one-time payments from the supplier to retail stores to secure shelf space for a product.[5] Trade spend is a discount off the price charged to retailers in exchange for promoting products through various methods, such as coupons, "buy-one-get-one-free" promotions, and participation in trade shows. The purpose of trade spend is to stimulate sales, but the expense is taken from the supplier's profit margin.[6]

Under the Shadewell license, gross sales of Mrs. Fields' branded retail products peaked in 2000 at $51.2 million and then declined each year thereafter to $39 million in 2005.[7] By 2006, Shadewell had put itself "in a financial hole" due to its "big infrastructure" and its aggressive use of trade spend and slotting fees.[8]

---

[3] Tr. 9-10 (Courtney).

[4] Tr. 78-79 (Courtney), 699 (Rummel).

[5] Tr. 17-18 (Courtney).

[6] Tr. 15-17 (Courtney).

[7] JX 76 at 4.

[8] Tr. 79 (Courtney).

Shadewell defaulted on the royalties it owed Mrs. Fields as well as payments it owed to Oak State, the contractor responsible for manufacturing the products.[9]

In 2006, Shadewell filed for bankruptcy and Mrs. Fields assumed direct control over the branded retail business, appointing Neal Courtney to manage it.[10] For the first eight to ten weeks, Mrs. Fields experienced product shortages because Oak State had stopped manufacturing the product.[11] In connection with assuming control over the business, Mrs. Fields hired a sales team and a product-supply manager, and developed an accounting department.[12] The transition in-house took approximately six months.[13]

After the branded retail business was transitioned in-house, sales dropped to $23 million in 2007 before recovering to $29.1 million in 2008.[14] For the next three years, annual sales remained within a fairly narrow range: $27.8 million in 2009, $29.3 million in 2010, and $29.6 million in 2011.[15] Analyzing the sales and trade spend figures from 2007 to 2011, an internal Mrs. Fields board presentation commented that "Trade spend continues to increase to maintain distribution and

---

[9] Tr. 699-700 (Rummel).

[10] Tr. 11-13 (Courtney), 700 (Rummel).

[11] Tr. 700 (Rummel).

[12] Tr. 1444-45 (Anson).

[13] Tr. 1445 (Anson).

[14] JX 76 at 4; *see also* JX 180 DB001194.

[15] JX 76 at 4.

drive velocity."[16] During this same five-year period, the profitability of the branded-retail business varied significantly:

| Year | Sales | Trade Spend % | Profit[17] |
|------|-------|---------------|------------|
| 2007 | $23.4 million | 12% | $1.1 million |
| 2008 | $29.1 million | 14.3% | $0.8 million |
| 2009 | $27.8 million | 18.4% | $2.3 million |
| 2010 | $29.3 million | 19.6% | $3.1 million |
| 2011 | $29.6 million | 21.6% | $2.0 million |

Around 2009 or 2010, Mrs. Fields scored a "big win" by obtaining shelf space from Walmart.[18] According to Courtney, Walmart is a "benchmark" for "every other major grocer, retailer in the country," and once product is on the shelves at Walmart, it gains credibility among other retailers and obtaining shelf space becomes easier.[19]

## C. Negotiations over the License Agreement

In 2011, Mrs. Fields and Interbake entered into licensing talks.[20] A considerable part of Interbake's business comprised "private-label" manufacturing, meaning that Interbake manufactured cookies sold under other companies' brands.[21] Mrs. Fields believed that Interbake's vertical integration, extensive experience with

---

[16] JX 76 at 4.

[17] JX 76 at 4; Tr. 127-28 (Courtney) (trade spend depicted as a percentage of gross sales).

[18] Tr. 29-30 (Courtney).

[19] Tr. 30 (Courtney).

[20] Tr. 33-35, 36-38 (Courtney); JX 70.

[21] Tr. 33 (Courtney); JX 10 at 32 (McDonough Dep.).

5

private-label cookies, and existing retailer relationships could be leveraged to increase distribution of Mrs. Fields cookies.[22]

Neal Courtney, who was now Mrs. Fields' Chief Operating Officer, and Seth Monette, Interbake's primary sales leader for retail private brands and contract manufacturing, were the primary negotiators. They exchanged drafts of a trademark license agreement through Mrs. Fields' broker, Stu Seltzer.[23] Other key players in the negotiations included Mrs. Fields' then-CEO, Tim Casey, and Interbake's then-President, Kevin McDonough.[24]

On February 3, 2012, Mrs. Fields sent Interbake the first draft of a proposed trademark license agreement that it prepared using as a template a previous license Mrs. Fields had with Unilever.[25] Section 15(e)(iii) of the draft, which Mrs. Fields inserted into the Unilever template, allowed for early termination of the agreement if Interbake failed to reach $25 million in net sales in any year.[26] The draft also required Interbake to meet minimum annual sales thresholds, ranging from $20

---

[22] JX 14 at 235-36 (Courtney Dep.).

[23] Tr. 47 (Courtney).

[24] JX 5 at 34, 63, 67-68, 114 (Monette Dep.).

[25] Tr. 43-44 (Courtney); Tr. 1092 (Monette); JX 17 at 120-22 (Seltzer Dep.); JX 81 MF00016671.

[26] JX 81. The provision contains an apparent typographical error because it refers to two different figures as the sales threshold: "*twenty* million *($25,000,000)* dollars per Contract Year." JX 81 (emphasis added).

million to $35 million in net sales from year 1 to year 5.[27]  In Section 19(c), Mrs. Fields represented and warranted that "it will not intentionally do anything to destroy or impair its existing image."[28]

On February 4, 2012, in an internal Mrs. Fields email, Casey asked Courtney about inserting a provision in the license agreement obligating Interbake to spend some minimum amount on advertising and marketing "to ensure [an] aggressive growth strategy."[29]  Courtney responded, "That's a little complicated because of trade spend and slotting fees.  Do you want a commitment above that?"[30]  Casey ultimately decided it was "not worth raising" the topic with Interbake because it would "complicate things."[31]

On February 16, 2012, the parties met and reviewed the draft agreement.[32]  A slide deck Mrs. Fields presented at the meeting stated that the Mrs. Fields brand "attracts the best franchisees because we give them the best support and the best economic model," that the brand is "on trend" and "still resonates with consumers" nearly "35 years later," that "we will build and support our brands because they are

---

[27] JX 81 § 5(b), Ex. C.

[28] JX 81.

[29] JX 84 MF0001120.

[30] JX 84 MF0001120.

[31] JX 84 MF0001120.

[32] JX 86; Tr. 49-50 (Courtney).

the reason we are here in the first place," and that "we will always maintain the integrity and taste of our current recipes."[33] On the other hand, one slide acknowledged that Mrs. Fields was "missing the mark" with aligning "consumer expectations across all channels."[34]

Later on February 16, Selena Sanderson, an Executive Vice President at Interbake, suggested in an internal email modifying the termination section to add an "out for Interbake in the event of brand deterioration" or a "quality issue" outside of Interbake's control, such as something in "another part of [Mrs. Fields'] business."[35] Section 19(c) of the license agreement later was revised to require Mrs. Fields to "continue to support the brand through advertising and marketing efforts consistent with past practice."[36]

On February 22, 2012, Interbake circulated a revised draft of the license agreement. Interbake proposed reducing the Section 15(e)(iii) termination threshold from $25 million to $20 million in net sales.[37] Mrs. Fields agreed to this change after a discussion between Courtney and Monette.[38] Interbake also added Section

---

[33] JX 96 IBF00058187, 00058194.

[34] JX 96 IBF582000.

[35] JX 87 IBF00042134.

[36] JX 99

[37] JX 89.

[38] Tr. 47-48 (Courtney).

15(e)(ix), permitting termination of the license agreement if Mrs. Fields made a "fundamental change" to the Mrs. Fields brand or marketing guidelines that renders Interbake's performance "commercially unviable," and Section 19(d), a representation and warranty by Mrs. Fields that it has no knowledge of any occurrence that could reasonably be expected to become materially adverse to Mrs. Fields' business, the value of the branded retail products, or Interbake's ability to consummate the transaction.[39] The parties exchanged another set of drafts on February 28 with minor alterations.[40]

On March 12, Interbake sent Mrs. Fields a revised draft of the License Agreement that renumbered Section 15(e) to Section 15(c), and specified that Section 15(c)(iii)—the minimum sales termination provision—must be triggered within 15 days following receipt of the annual report.[41] Section 15(c)(ix) now allowed termination should Mrs. Fields breach a representation or warranty, or materially damage the value of its brand such that Interbake's performance is rendered commercially unviable. Finally, the provision requiring Interbake to achieve minimum sales volumes each year was "INTENTIONALLY DELETED."[42]

---

[39] JX 89.

[40] JX 93; JX 95.

[41] JX 99.

[42] JX 99 §5(b); JX 81 §5(b); JX 104 §5(b).

Section 15(c)(iii) in the final License Agreement is silent as to which (or both) of the parties may terminate the agreement if annual sales fall below $20 million. Courtney testified that Mrs. Fields asked for the provision "to ensure that a minimum sales level was maintained, because [Mrs. Fields] had worked hard to build the business back up," but he could not recall discussing with Monette or anyone else at Mrs. Fields who would have the right to invoke the provision.[43]  On the Interbake side of the table, Monette recalled asking Courtney for "downside protection" at some point,[44] and McDonough testified that he instructed Monette "to make sure [Section 15(c)(iii)] was reciprocal,"[45] but there is no evidence in the record that anyone at Interbake actually discussed reciprocity with Mrs. Fields.

### D.    "Cookie Confusion"

During its negotiations with Interbake, Mrs. Fields was experiencing problems with product quality,  In particular, the brand was suffering from what witnesses described as "cookie confusion" attributable to the fact that Mrs. Fields sells cookies in various channels (*e.g.*, franchising, branded retail, gifting) that have different shelf lives and are baked using different recipes.[46]  Pre-packaged cookies like those sold in retail stores require preservatives and other additives to make them

---

[43] Tr. 45, 90 (Courtney).

[44] Tr. 1090-1091 (Monette).

[45] Tr. 1006-07 (McDonough).

[46] Tr. 115-16 (Courtney); Tr. 1615 (Barr).

shelf-stable that are not necessary for fresh-baked cookies. Thus, when a consumer purchases a pre-packaged cookie expecting the quality and taste of a fresh-baked cookie, the negative experience damages the Mrs. Fields brand.[47]

A January 2012 Mrs. Fields board presentation stated that the current branded retail group "product does not meet the Mrs. Fields cookie standard or consumer expectation impacting repeat purchase and overall velocity."[48] In the same vein, Casey remarked to Courtney in a February 1, 2012 email discussing "Priorities" that "We have to fix quality in all three channels—it's our brand."[49]

On March 2, 2012, Casey sent an internal email to the Mrs. Fields board outlining key initiatives for 2012. The number one initiative was to "Reformulate the recipe of the cookies in all three channels: franchise stores . . . gifting . . . and branded retail."[50] The email further explained that reformulating the recipes for its branded retail products was "less of a priority as a licensing partner is pursued."[51] True to this last email, Mrs. Fields did not reformulate the branded retail recipes after it became apparent it would enter into a license agreement with Interbake.

---

[47] Tr. 115-18 (Courtney); Tr. 1112 (Monette); *see also* JX 189

[48] JX 76 at 3.

[49] JX 78 MF00011037.

[50] JX 98 DB000284.

[51] JX 98 DB000284.

## E.    The License Agreement

On March 16, 2012, Mrs. Fields and Interbake entered into the License Agreement for an initial five-year term ending December 31, 2017, with an option to renew for an additional five years.[52]  The License Agreement provides Interbake with the exclusive right and license to use specified trademarks, recipes and other intellectual property to manufacture, market, and sell Mrs. Fields branded products through certain distribution channels within a defined territory.[53]

The License Agreement contains no provision requiring Interbake to use best or reasonable efforts, to achieve a minimum amount of sales in a given period, or to spend a minimum amount on trade spend or other forms of promotion in a given period, but it does require Interbake to pay Mrs. Fields a minimum royalty of $2 million each year for the last four years of the contract.[54]  The License Agreement also contains no prohibition against Interbake selling competing products.

Both parties were thrilled with the License Agreement at the time.  Courtney at Mrs. Fields was impressed with Interbake's "tremendous expertise in the cookie industry," its success in the private label business, and the backing it had from

---

[52] JX 104 § 15(a, b), Ex. A.

[53] JX 104 § 1(a).

[54] JX 104 § 5(a), Ex. D-1.

Weston Foods.[55] He thought that the relationship was a "perfect fit."[56] McDonough at Interbake remarked in an internal memorandum that the project was "a unique opportunity to obtain an iconic brand in the cookie category for minimum investment," and would give Interbake "entry into branded market with a leading cookie brand that has high brand recognition and opportunity for growth."[57]

### F.     Transition of the Business from Mrs. Fields to Interbake

Between March 16, 2012 and November 1, 2012, Mrs. Fields continued operating the retail brand business while Interbake prepared its sales staff and manufacturing capabilities to take over the operations. Mrs. Fields' lead salesman, Robert Rummel, sent Monette weekly reports and commentary about all branded retail sales.[58]

In July 2012, Interbake promoted Monette to Vice President of Retail.[59] That same month, Rummel traveled to Interbake's headquarters in Richmond, Virginia to bring its marketing department up to speed on what was needed to market the Mrs. Fields products.[60] Courtney and Rummel provided Interbake with the sales details

---

[55] Tr. 58 (Courtney).

[56] Tr. 58 (Courtney).

[57] JX 97 IBF00045415.

[58] Tr. 736 (Rummel); JX 3 at 137-38 (Rummel Dep.).

[59] JX 5 at 6 (Monette Dep.).

[60] Tr. 738 (Rummel).

13

of all accounts, including trade spend, off-invoice allowances, and promotional activity.[61] Mrs. Fields held weekly meetings with Interbake's supply team to ensure that as Mrs. Fields wound down production, Interbake could ramp up production.[62]

To produce the Mrs. Fields cookies, Interbake invested $5 million in upgrading its production lines.[63] The investment added cooling capacity required to produce soft-baked cookies and certain packaging capabilities, in particular for selling single-serve cookies.[64]

While the transition was underway, product quality continued to be a concern internally at Mrs. Fields. In an August 15, 2012 meeting, the Mrs. Fields board discussed the "causes and effects" of declining product performance at CVS and Shopper's Drug Mart.[65] The board then decided that Mrs. Fields would "strongly emphasize to Interbake the need to improve the quality of the current product line."[66]

On November 1, 2012, Rummel was transitioned from Mrs. Fields to become an Interbake employee, and Interbake took over operation of the business.[67]

---

[61] JX 122; Tr. 37-38 (Courtney), 742 (Rummel).

[62] JX 15 at 22-24 (Erpelding Dep.).

[63] Tr. 960-61 (McDonough).

[64] JX 107 IBF00042240; Tr. 1788-89 (Thomas).

[65] JX 118 ZC002279.

[66] JX 118 ZC002279.

[67] Tr. 66 (Courtney), 746 (Rummel).

### G.     Concerns with the Mrs. Fields' Brand

After Interbake assumed operational responsibility for branded retail, Mrs. Fields continued to grapple with weakness in its franchise business, continuing quality problems, and brand stagnation.  On or about November 27, 2012, Tim Casey, Mrs. Fields' CEO at the time, delivered a presentation for the board of Famous Brands, Mrs. Fields' parent company, highlighting the challenges facing the Mrs. Fields brand.[68]  Casey discussed the year-after-year decline in the number of franchise stores since 2007.  Cautioning that "[b]rick and mortar store fronts are an essential part of the brand's health," his presentation stated that "[o]ur base continues to erode putting distribution and brand equity at risk."[69]  Casey's speaker notes acknowledged that "[w]e are late to focus on the Mrs. Fields Brand,"[70] and that "[w]e have close to a $300M brand with little to no investment in brand stewardship!"[71]

The presentation included a "Case Study" of the Branded Retail Group ("BRG")—the business licensed to Interbake—as a "good example" of what happens to a business when investment in a brand is neglected:

- With limited investment over the last 6 years the BRG business has realized a relatively flat top line and a very inconsistent bottom line

---

[68] Tr. 146, 154 (Courtney); JX 134.

[69] JX 134 ZC003090-91.

[70] JX 134 ZC003079.

[71] JX 134 ZC003079, ZC003097.

- If the BRG business had not been licensed early this year, significant investment would have been needed to sustain and grow the business
  - Essentially, "INVEST or DIE"
- The BRG scenario is a very good example of what happens when investment isn't made to strengthen and sustain the brand . . . Very predictable results.[72]

The presentation also included a "5 Year Strategic Plan" that summarized the "Current Reality" facing Mrs. Fields, which reiterated the need for additional investment in its brand:

2. **We need to invest in the brands to support growth**
   1. No significant investment in brand marketing to support our franchising or licensing partners has occurred in several years.
3. **Mrs. Fields needs revitalizing**.
   1. Mrs. Fields brand has not been addressed in over 10 years
   2. Store unit economics don't work therefore franchising is stagnant[73]

Addressing point 2.1 quoted above, Casey explained that his presentation was referring to "investment outside the traditional marketing expenditures that hit the P&L" that Mrs. Fields used "to normally support the brand."[74] Casey recommended investing $10 million in 2013 and 2014 on top of the traditional marketing expenditures that Mrs. Fields already was incurring to support "Growth Initiatives," part of which was necessary to increase brand awareness across all of Mrs. Fields'

---

[72] JX 134 ZC003100.

[73] JX 134 ZC003122.

[74] JX 12 at 112-13 (Casey Dep.).

16

business channels.[75] The proposed investment was never made, and Casey left the company three months after delivering the presentation.[76]

**H.     Interbake's Initial Efforts to Acquire Mrs. Fields in 2013**

Shortly after assuming operational control over the Mrs. Field retail business as licensee, Interbake expressed interest in acquiring the business outright. A December 13, 2012 slide deck outlining Interbake's strategic plan for 2013-2017 stated that one of Interbake's strategic initiatives was to "Secure Mrs. Fields long-term brand control and drive growth of the business and brand (new items, new customers, unlocking trade efficiencies, meaningful innovation.)."[77] The deck identified the "[f]ailure to secure long term brand control" as a "key risk" to expanding Mrs. Fields "across other product platforms and channels."[78]

In a January 29, 2013 letter, Interbake expressed its "preliminary interest" in purchasing the Mrs. Fields brand for the "retail and licensing segment of the business" for approximately $30 million.[79] Interbake followed up with a letter of intent dated March 6, 2013, offering to purchase the Mrs. Fields brand for $32 million and to provide Mrs. Fields with a worldwide, perpetual, royalty-free license

---

[75] JX 134 ZC2003123; Tr. 153-54 (Courtney).

[76] Tr. 154-155 (Courtney).

[77] JX 131 at 2.

[78] JX 131 at 4.

[79] JX 136 IBF00042798.

for the franchise and gifting business.[80]  After Mrs. Fields balked at the proposal, Interbake sent a revised letter of intent on May 15, 2013, proposing that Mrs. Fields retain ownership of the brand while providing Interbake a worldwide, perpetual, royalty-free license for all purposes other than franchising and gifting for $22 million.[81]  Courtney remarked in a May 22 internal email to Joe Nasr of Z Capital: "Obviously, this is not going to fly."[82]

## I. Z Capital Gets Frustrated with Interbake, More Discussions About Selling the Retail Brand, and Internal Turmoil at Mrs. Fields

On January 28, 2014, James Zenni, President and CEO of Z Capital and Chairman of the Board of Mrs. Fields, stated in an email to one of his partners that he wanted to "break" or "modify" the License Agreement because it is "killing ou[r] brand."[83]  Zenni reiterated his views later that day to fellow board member David Barr, blaming cookie confusion between Mrs. Fields' premium products and Interbake's "crap" for crippling Mrs. Fields' ability to expand its other business lines:

> I want to revisit the Interbake situation / contract and I don't want to sell the rights (unless it's a huge number today).  It's clear to me that

---

[80] JX 214 ZC005272.

[81] JX 215 ZC005282.

[82] JX 215 ZC005279.

[83] JX 188 ZC004643.

their product is not great and killing our brand. To crank up gifting and franchising and have their crap on the shelf doesn't help.[84]

Barr sympathized with Zenni's concerns, but reminded him that "their crap" was once "our crap:"

> I understand and do not disagree with your sentiments. In fact, many years ago while at Great American Cookies, this is exactly why I never went into packaged goods even though we were approached. I could never resolve the quality difference. With that said, we need to remember that 'their crap' they are selling was 'our crap' just two years ago and we sold it to them.[85]

While Z Capital was expressing frustration with Interbake, Interbake continued to pursue an acquisition of Mrs. Fields' branded retail business. As of May 2014, Interbake was proposing either to acquire the Mrs. Fields' licensing channel for between $36-38 million, or to secure a ten-year, extendable option to acquire the business at higher prices in exchange for an upfront payment of $500,000.[86]

On May 31, McDonough informed George Weston that "[w]e finally have agreement to non-binding financial terms with Mrs. Fields for the purchase of the perpetual rights to the Mrs. Fields brand for essentially all bakery products across all channels world wide with the exception of their Mall stores and on-line gifting."[87]

---

[84] JX 189 ZC004645.

[85] JX 189 ZC004645.

[86] JX 197; JX 207; JX 216.

[87] JX 220.

The parties continued to negotiate a potential sale of the licensed business to Interbake through the summer and fall of 2014,[88] but Mrs. Fields was lukewarm toward Interbake's proposals. On June 15, Zenni of Z Capital instructed Courtney and his team not to "engage in any discussions with Interbake on any topic."[89] Instead, Z Capital and the Mrs. Fields board assumed direct control over the negotiations with Interbake.

On June 27, Courtney emailed Zenni asking permission to resume contact with Interbake, noting there were "a couple of items they need immediate approval on or they will lose the sales opportunity (primarily promotional)." Courtney never received approval and was fired later that day.[90] Mrs. Fields also terminated its entire marketing department except for one person, Stephanie Brady, who remained until January 2015.[91]

Courtney's termination marked the beginning of a two-year interregnum where three individuals were appointed and then removed in quick succession as Mrs. Fields' CEO. Courtney was succeeded by Joyce Hrinya, who served in an interim capacity for about six months until he was succeeded by Jeff Werner, who

---

[88] JX 214; JX 221; JX 240.

[89] JX 222.

[90] Tr. 217 (Courtney).

[91] Tr. 1419 (Anson); JX 7 at 59 (Werner Dep.).

also served for about six months.[92] They were followed by Jonathan Drake, who served as CEO for just five months before he was replaced by Werner, who ran the company for a second stint of about five months before being replaced in August 2016 by Dustin Lyman, who was serving as CEO as of the time of trial.[93] In total, six different individuals served as the CEO of Mrs. Fields in seven separate tenures from March 2012, when the License Agreement was signed, until August 2016.

In October 2014, George Weston's annual enterprise risk management review included a discussion of the "risk related to not having full control of Mrs. Fields brand," a topic that appeared in the previous year's review.[94] The presentation identified as one of its "Current Mitigation Actions" the need to "Continue to meet Mrs. Field's targets,"[95] and contemplated having McDonough meet with Mrs. Fields' private-equity group in mid-October to discuss brand ownership with the goal of resolving the issue by the end of the year.[96] The planned October meeting occurred, but the parties failed to come to an understanding and the negotiations ended soon after.[97]

---

[92] *See* Tr. 1586-89 (Lyman).

[93] *See* Tr. 1586-89 (Lyman); JX 13 at 7 (Lyman Dep.).

[94] JX 619 at 8.

[95] JX 619 at 8.

[96] JX 619 at 8.

[97] JX 8 at 161-63 (Kipley Dep.).

On November 28, 2014, an enterprise risk management update circulated among senior George Weston, Weston Foods, and Interbake employees, including McDonough, noted that discussions to acquire Mrs. Fields had ended and that going forward Interbake would need to "Protect volume and EBIT as we transition from Mrs. Field's by pursuing licensing arrangements with other biscuit brands."[98] The update also identified a series of future mitigation actions with respect to Mrs. Fields, including:

- Invest prudently in brand insights and R&D (limit of $500K-$700k) to achieve 2016 targets, while taking into account risk of losing brand in long-term
- Hire brand resources to conduct R&D / consumer insights
- Build Mrs. Fields platform to include other channels and products
- Target new business accounts.[99]

**J.      Interbake Ends Its Pursuit to Acquire the Mrs. Fields Retail Brand**

In February 2015, consistent with its November 2014 enterprise risk update, Interbake hired Lauren Reynolds as a brand manager to market Mrs. Fields products.[100] Notwithstanding the breakdown in negotiations with Mrs. Fields that occurred in October 2014, Interbake still believed in early 2015 that it would be "successful in buying long-term rights to the brand ownership."[101]

---

[98] JX 266 at 3.

[99] JX 266 at 3.

[100] Tr. 1646 (Reynolds).

[101] Tr. 1069 (McDonough).

On April 1, Reynolds shared her 30-day observations on the Mrs. Fields brand with Interbake leadership. The presentation stated: "Mrs. Fields is a strong brand equity that has the potential for long-term success in the cookie category."[102] Reynolds forecasted sales for 2015 at $28.24 million, an 18% increase over 2014.[103] The presentation also reiterated Interbake's goal to "protect control of brand at Retail," which Interbake would pursue by continuing "to negotiate to gain ownership of the brand."[104]

In early 2015, Z Capital decided to solicit bids to sell Famous Brands.[105] An April 15 George Weston presentation summarized the opportunity and the rationale for making a bid, stating that "[w]e continue to believe that Mrs. Fields is a well-recognized, premium brand that is an attractive component of our product portfolio."[106] The "Mrs. Fields business," the presentation continued, "generated $18M of revenue (5% of total Interbake) and $3M of EBITDA (16% margin in 2014) – this is currently the highest margin business in Interbake (excluding NDS)."[107] The presentation further stated: "Loss of the Mrs. Fields brand would be detrimental

---

[102] JX 288 at 12.

[103] JX 288 at 8.

[104] JX 288 at 6.

[105] JX 290 at 2.

[106] JX 300 at 5.

[107] JX 300 at 5.

to our strategic growth plan and our ability to grow other branded business."[108] On April 20, Interbake submitted a $50 million bid for both the branded retail business and Mrs. Fields' e-commerce platform and gifting business.[109]

On April 30, 2015, Interbake and Mrs. Fields held a strategic planning meeting. Zenni, Monette, and Reynolds were among the attendees. Product quality was a primary topic. Rebecca Hamilton, a Mrs. Fields project manager, recounted that "[t]here was a lengthy discussion regarding the quality of the Interbake cookie and what we need to do to make formula adjustments. Laura [Reynolds] and Seth [Monette] suggested our R&D teams work together to evaluate and modify existing formula's to better represent the Mrs. Fields brand."[110]

Another topic discussed at the April 30 meeting was a new promotional program Interbake was undertaking with the United Service Organizations between May and July 2015 called "Share Your Hero." The promotion invited customers to submit stories about their individual heroes in return for coupons and product samples, with the winner to receive one year's worth of cookies and to be featured on Mrs. Fields cookie boxes.[111] Interbake asked to "tie the USO program" to the official Mrs. Fields website to appeal to a broader audience, but Mrs. Fields refused,

---

[108] JX 300 at 5.

[109] JX 305.

[110] JX 311.

[111] JX 311.

quarantining the Interbake cookies from Mrs. Fields' other products "to avoid further cookie confusion in the market place."[112]

On May 6, 2015, Mrs. Fields rejected Interbake's offer to acquire Mrs. Fields' branded retail business and its e-commerce platform and gifting business for $50 million. An internal Weston/Interbake email reported that "Z-Capital has decided to continue to own the business and execute on its business plan."[113]

### K. Interbake Plans to Exit the Mrs. Fields Relationship

Z Capital's reversal of its decision to sell Famous Brands marked a turning point in the relationship between Mrs. Fields and Interbake. After two years of sporadic discussions, Interbake was faced with the reality that it would not be able to acquire control of the Mrs. Fields brand and that its role would be limited to that of a licensee. This realization set in motion a desire on Interbake's part to exit its relationship with Mrs. Fields. As discussed below, the initial plan was to exit when the term of License Agreement expired at the end of 2017, but the timetable was accelerated later in the hope of negotiating an exit in mid-2016.

On May 7, 2015, Selena Sanderson at Interbake emailed Monette and Reynolds, asking for Reynolds' recommendation "on additional spend given that we will continue to be" licensees and not owners, and Monette's thoughts on the "sales

---

[112] JX 311; Tr. 1651-52 (Reynolds).

[113] JX 313 IBF00007312.

benefit for this spend (vs what's in the budget)."[114]  In response, Monette identified a new risk of $1 million in lost sales due to "[c]ore business softness,"[115] which he described as the "impact of zero consumer spend."[116]  On June 2, Reynolds emailed Tiffany Reeve, Interbake's Vice President of Financing, explaining that the trade spend in the budget was committed to various projects and that no additional spend was available for the second half of 2015.[117]

On June 15, Daryl Gormley took over as President of Interbake, reporting directly to McDonough, who had been promoted to President of Weston Foods' frozen and biscuit divisions.[118]  On the same day, Reynolds circulated an updated brand strategy deck.[119]  The presentation estimated that sales for 2015 would be $21.5 million, down 10.2% from the prior year and down 15.7% from the 2015 budgeted amount, a drop "driven by strong headwinds, including poor retail velocity," and that sales for 2016 would be $21.7 million.[120]  The presentation also referenced a planned exit from the relationship with Mrs. Fields in 2017:

---

[114] JX 313 IBF00007312.

[115] JX 319 at 2; Tr. 1189-90 (Monette).

[116] JX 313 IBF00007311.

[117] JX 324.

[118] Tr. 537 (Gormley); JX 10 at 5-6 (McDonough Dep.).

[119] JX 328.

[120] JX 328 at 2.

- Planned exit from Mrs. Fields brand and license in 2017 based upon poor partnership relationship and significant investment needed to reverse brand health
  - Minimum Gross Sales of $34.0 million are needed by the end of 2016 for license auto-renewal; large gap exists to achieve minimum[121]

The plan to exit the Mrs. Field brand and license in 2017 was reiterated in a Weston Foods Brand Strategy Update dated June 22, 2015, which noted that: "Brand health is poor and we anticipate continued deterioration of the brand equity due to lack of support and investment from Famous Brands."[122] Paviter Binning, George Weston's President and CEO, confirmed that, as of mid-June 2015, it was Interbake's plan to exit the relationship with Mrs. Fields in 2017.[123]

Although it planned to exit the Mrs. Fields business, Interbake still had a business to run in the meantime. On June 23, Reynolds emailed Hamilton at Mrs. Fields:

> I wanted to reach out to see if you had an R&D contract you would like us to work with on the cookie formulas? We would like to remove PHO [partially hydrogenated oils] from all formulas and feel this is a great opportunity to optimize the product. Please let me know who I should be working with on this.[124]

---

[121] JX 328 at 2.

[122] JX 331 (Branded Strategy Update) at 2.

[123] JX 25 at 90-91 (Binning Dep.).

[124] JX 341.

Three weeks later, Hamilton relayed the email to Famous Brand's Chief Marketing Officer, stating: "Lauren's second email inquiring about who to work with from our team on the Interbake formulas. I basically told her that we had some changes internally and were trying to figure out the best person for her to work with and that I would get back to her."[125] Mrs. Fields never responded to Reynolds' request for a contact person, and never offered any resources to address cookie confusion or the formula problem.[126]

While mid-2015 Interbake internal documents were reflecting its concern that the Mrs. Fields brand was in decline, senior executives overseeing Mrs. Fields also were discussing internally problems with the brand. One email exchange in August 2015, for example, viewed the shrinking pipeline for franchises as a "brand problem and product development problem," and noted the negative effect that discounting in the retail channel was having on the brand:

> The significant discounting of Mrs. Fields' products is a weakness. Every day I receive a different email offering Mrs. Fields cookies at a discount. I believe that this cheapens the brand and I believe that it is training Mrs. Fields' customers to never pay full price because they should wait for a coupon or other discount offer, which inevitably will be arriving sooner rather than later. The discounting is a poor tactic that needs to be reigned in – gifting has been running on their own unchecked chasing sales.[127]

---

[125] JX 341.

[126] Tr. 1674-1675 (Reynolds).

[127] JX 352 MF00033550-51.

## L. Interbake Accelerates Its Plan to Exit the Mrs. Fields Relationship

In July 2015, Gormley and his staff at Interbake worked on developing a plan to exit from the Mrs. Fields relationship. On July 1, Gormley asked Monette how much Interbake was planning to spend "to support Mrs. Fields" for the remainder of the License Agreement and the estimated return on that investment.[128] Monette responded that trade spend "just follows sales up or down" as a percentage of sales, and that he anticipated trade spend for 2015 would be $4.2 million (or 25%) of estimated sales of $19 million.[129]

On July 3, Gormley asked Monette to "review the Mrs. Fields spending in more detail – what are we investing, what is the return within the agreement, what are alternatives and the associated financials including the payment rate if we drop below threshold, what is the impact to customers/customer relationships?"[130] Monette responded that the trade spend Interbake had set up "is in line with the category average as we understand it (25% of gross sales)" and cautioned against reducing it:

> There are no required spending minimums within the agreement. The trade we've set up for the business is in line with the category average as we understand it (25% of gross sales). . . . On the Mrs. Fields consumer spending, it really has been and is quite limited. To the extent that we 'invest' in the brand it really has been through our trade spend

---

[128] JX 333.

[129] JX 333.

[130] JX 336 at 2.

which is needed to stay on the shelf and drive any customer support whatsoever. If we start to peel back trade in a significant way then our turns, distribution and customer relationships will suffer. I would not recommend that course of action.[131]

By mid-July, Interbake's plan had shifted from exiting the Licensing Agreement at the end of the term in 2017 to "[m]anag[ing] Mrs. Fields business to maximize cash generation without alienating customers while planning for transition within 12 months, in advance of the agreement termination."[132] On July 23, 2015, Gormley's team reported their goals for the second half of 2015. One of Reeve's goals was to "[d]evelop an exit and backfill strategy for Mrs. Fields."[133] Monette's objectives included using trade spend to ensure that Interbake reached $20 million in sales for the year and developing a two-year plan to manage the exit from the relationship with Mrs. Fields.[134]

Also on July 23, representatives of Mrs. Fields and Interbake met to discuss the state of their relationship.[135] Dustin Lyman, then Vice President of Finance and soon to become Mrs. Fields' new CEO, was one of the attendees. He testified that Mrs. Fields hoped to reaffirm to Monette that Mrs. Fields would be "available at the

---

[131] JX 336 at 2.

[132] JX 338 IBF00021982.

[133] JX 343 (Reeve).

[134] JX 343 (Monette).

[135] JX 344; Tr. 1282 (Lyman).

highest levels of the company to interact with him and the rest of Interbake management."[136]  Among the topics discussed was the USO Share Your Hero campaign, which both sides agreed was a success, and continuing concerns about cookie quality.[137]  On the latter issue, Interbake pointed out that it had been using "the recipes they had been given" by Mrs. Fields and that if Mrs. Fields wanted to change the recipes, it could provide new ones, to which Mrs. Fields responded that it "did not have the skill set within the company to come up with a new recipe formulation."[138]

In the months after its July meeting with Mrs. Fields, Interbake implemented its plan to "backfill" the "significant" "sales and EBIT gap" that would be left by the planned exit from the Mrs. Fields relationship.[139]  At the same time, Interbake did not "want to give Famous Brands the opportunity to leave the agreement at year end" by failing to meet the $20 million sales threshold in Section 15(c)(iii) of the License Agreement.[140]

---

[136] Tr. 1291-92 (Lyman).

[137] Tr. 1284-86 (Lyman).

[138] Tr. 1285-86 (Lyman).

[139] JX 695.

[140] JX 358 IBF00034922.

In an August 27 email, Monette said he would pull together a plan to meet the $20 million minimum by using trade spend and other approaches.[141] A few days later, on September 2, Monette emailed his sales team to inform them that he had received "buy-in and support from Weston Senior Leadership to take one last trade deal driven crack at closing our year strong on Mrs. Fields," and instructed the sales team to "spend like drunken sailors:"

> I have received buy-in and support from Weston Senior Leadership to take one last trade deal driven crack at closing our year strong on Mrs. Fields.
>
> The goal is topline volume 1st, incremental contribution to plan 2nd. What does this mean? It means that we can throw out the existing plan and TURN UP THE HEAT.
>
> For example, have a 2/$5 planned that will generate 500 cases in orders? Then let's get a 2/$4 planned that will generate 1500 cases!
>
> All ideas are on the table so come prepared with ideas and an open mind. I don't want to hear anything about what hasn't worked or what is ideal.
>
> The only thing I'm interested in is what do you need to drive incremental volume for the balance of the year. Demos? Shippers? IRC's? Sharpened Price Points? Co-Ops? Display fees? Menu?
>
> Tomorrow's call will be to talk about focus and how.
>
> It's not often that we get the green light to spend like drunken sailors…plan on being aggressive and moving fast.[142]

---

[141] JX 358.

[142] JX 360; *see also* JX 367.

While Monette's sales team had the green light to increase trade spend to increase sales, Reynolds was asked to cut back on marketing expenses. On September 30, Reeve emailed Reynolds, asking, "[h]ow much of this can you pull back on if we say we are not going to continue to support MF with marketing $?"[143] Reynolds replied that "I'm at bare bones for Mrs. Fields for 2016. If we no longer have the brand, it is a different story, but for now I would say I have already pulled back as much as possible to keep things up and running at a minimum."[144]

## M. Interbake's Private Label Initiatives

At the same time that Monette and his sales team were pushing to meet the $20 million sales threshold for 2015, Interbake was exploring ways to "backfill" the volume it expected to lose when it exited its relationship with Mrs. Fields.[145] Interbake started by launching a series of private-label projects to develop substitute products in-house for this purpose.

On or about October 28, 2015, at Weston Food's third quarter review meeting, Interbake presented an updated Mrs. Fields exit plan that contemplated negotiating an "end date" to its contract with Mrs. Fields in the first half of 2016, and replacing its products through a "Three Prong Replacement Strategy:"

- Leverage 2015 $20MM minimum miss for early exit

---

[143] JX 697.

[144] JX 697; *see also* JX 698.

[145] Tr. 509-11 (Gormley).

- Negotiate first half 2016 end date with Famous Brands
- Three Prong Replacement Strategy
  - Project Capricorn for US Mass, Grocery and Club
  - Two SKU value soft baked line for C-Store
  - Exploring "donut" cookie for Shoppers/LCL
- Minimize inventory risk of product and supplies[146]

The first prong, Project Capricorn, was a "high quality, chocolate chip-based cookie line of products" with packaging "completely different" from the Mrs. Fields product.[147] The Mrs. Fields cookie was soft-baked and packaged in a carton. The Project Capricorn product was a hard cookie that would be sold "in film packaging with a tray," which meant that the Project Capricorn product could not go in the same spot on the shelf as the Mrs. Fields cookie.[148]

The second prong was known as Project Bubba. It was an individually wrapped single-serve cookie that was to be sold in the convenience store channel using different recipes and flavors than the Mrs. Fields single-serve product but would be sold in the same size packaging.[149] The Project Bubba cookie never made it past the pilot phase. [150]

---

[146] JX 393 (Weston Biscuits – 3Q Review & Strategic Plan Update) at 13.

[147] Tr. 1694 (Reynolds); JX 405 (Project Capricorn Key Initiative Charter).

[148] Tr. 586-88 (Bagwell).

[149] Tr. 590-92 (Bagwell); JX 405 (Project Bubba Key Initiative Charter).

[150] Tr. 592 (Bagwell).

The third prong was known as Project Sugar Shack. It was a "doughnut cookie," "a completely new innovation" intended for the Canadian market that had "nothing to do with the Mrs. Fields actual product."[151]

In November 2015, Interbake provided samples of the Project Capricorn product to Walmart when it asked to see a product similar to one that Interbake made in Canada under the "Decadent" brand name.[152] On December 18, Walmart notified Interbake that it was not interested in Project Capricorn.[153]

Projects Capricorn, Bubba and Sugar Shack were never completed, and the products contemplated by these three projects were never sold to any retailer or consumer.[154] After Project Capricorn failed to draw any interest from Walmart, Interbake adopted another project to make two new cookies for Walmart called "Walmart Homestyle,"[155] which it planned to sell in packaging with the same dimensions as the Mrs. Fields' packaging.[156] Interbake originally developed Project Homestyle as a value soft-baked cookie for Dollar General (under the Clover Valley

---

[151] Tr. 510, 514 (Gormley); Tr. 594-96 (Bagwell).

[152] Tr. 1694 (Reynolds); JX 407. Although the record is unclear, it appears there also were some discussions about Project Capricorn with Rite Aid and perhaps with Delhaize. *See* JX 428 IBF00009204 (Rite Aid); Tr. 908-10 (Stone) (Delhaize).

[153] JX 420.

[154] Tr. 508, 578-79. (Gormley); *see also* Tr. 587, 594, 597 (Bagwell), 720-21 (Rummel), 826-27 (Stone), 1693 (Reynolds).

[155] JX 426, JX 434.

[156] JX 440 IBF00011786.

label) with less expensive ingredients than the Mrs. Fields premium brand.[157] It ultimately was not sold to Walmart or, besides Dollar General, any other customers.[158]

## N. Interbake Explores a Partnership with Back to Nature

Going into 2016, Interbake's "backfill" strategy became focused on a potential partnership with Back to Nature Foods Company, LLC ("Back to Nature"), a natural food company. On January 29, 2016, Gormley and McDonough met with Vincent Fantegrossi, President and CEO of Back to Nature, who recounted the discussion in an email that day:

> Interbake is very frustrated with Mrs. Fields – the brand is owned by a PE company that won't spend against it, no marketing or trade spend – has had six presidents in three years. [McDonough] tried to buy the brand and they don't want to sell it. His strategy is to replace the Mrs. Fields by offering a branded and/or private label offering. They can terminate in less than 60 days, we are targeting a July 1 kickoff. I pressed on the fact that a branded replacement assures better success of transitioning space than waiting for PL product development, etc. Something we are going to need to push. They project this to be worth $3 million in sales to BTN. If we could get a bigger slice, it could go a lot higher. They feel we need four SKU's to do that (we currently have two).[159]

---

[157] Tr. 588-90 (Bagwell), 861-65 (Stone).

[158] Tr. 1427-28 (Anson); JX 547.

[159] JX 447 BTN000146.

In mid-February, Interbake and Back to Nature executives met in Florida to discuss the proposed joint venture.[160]

On March 22, Gormley and Stephanie Bagwell, a program marketing manager at Interbake, spoke with Back to Nature and agreed "to support the Mrs. Fields backfill plan" using existing Back to Nature formulations for seven cookies and "existing Mrs. Fields private label formulation[s]" for seven other cookies, and to develop four other formulations.[161] The next day, Fantegrossi informed his team about a meeting with Interbake planned for April 6, stating: "[t]his is **confidential** because it has not been announced, but we are working with Interbake toward replacing Mrs. Fields with [SnackWell's and Back to Nature] everywhere Interbake controls it . . . They are notifying Mrs. Fields (Famous Brands) on April 5, then coming to Naples on April 6 to scope our plan of attack."[162] SnackWell's is a non-organic brand owned by Back to Nature. [163]

On March 24, Interbake sent Back to Nature some recent data on its sales of Mrs. Fields cookies.[164] Several days later, Interbake sent Back to Nature packaging

---

[160] JX 469 at 2.

[161] JX 506 IBF00021591-92.

[162] JX 517 BTN001347.

[163] Tr. 389 (Gormley), 597 (Bagwell). The proposed SnackWell's cookies were at a lower price point than the Back to Nature cookies, and were never produced. Tr. 389-91 (Gormley), 604, 607 (Bagwell).

[164] JX 522.

specifications Interbake had used for the Mrs. Fields products.[165] An internal Back to Nature email comments that it was "attempting to stay close to Mrs. Fields traditional architecture, while respecting the Back to Nature Brand" to give "retailers an easy solution to replace the Mrs. Fields product slot on shelf."[166]

While Interbake was exploring a transition to Back to Nature in March, it was closely managing its Mrs. Fields packaging materials and inventory levels. This led to some product shortages[167] and the decision to discontinue at least one of its flavors: the red velvet cookie.[168]

### O.    Mrs. Fields' Audit Request

Under the License Agreement, Mrs. Fields is entitled to review and audit "relevant financial books and records" of Interbake.[169] On November 16, 2015, Mrs. Fields sent Interbake a letter asking to conduct an "inspection of books and records relating to the License Agreement."[170] The letter stated that the inspection would be conducted by Paul Crystal, a consultant who performs licensee contract compliance

---

[165] JX 518, JX 529.

[166] JX 529.

[167] JX 486, JX 491.

[168] JX 485, JX 490.

[169] JX104 § 7(c).

[170] JX 402 CAS000113.

reviews, and enclosed an extensive questionnaire and lengthy lists of items Crystal wished to review onsite and prior to arrival.[171]

On November 24, Interbake objected to Mrs. Field's request as "overly broad" and "outside the scope of the commitment between the parties under the Agreement."[172] After the parties discussed the parameters of the audit in December 2015, the onsite inspection occurred over the course of two days in February 2016.[173]

On March 4, 2016, Crystal requested some additional information as a follow up to his onsite visit, which was provided on March 15 and 21.[174] Later in the day on March 21, Crystal sent Lyman a 37-page draft audit report.[175] After March 21, Crystal had no further communications with Interbake, and was not asked by anyone at Famous Brands or Z Capital to follow up on his draft audit report.[176]

### P. Interbake Seeks to Terminate the License Agreement as It Continues Discussions with Back to Nature and Walmart

On April 5, 2016, McDonough and Gormley of Interbake met with Lyman and Kipley, a Mrs. Fields board member, in Toronto. Gormley informed the Mrs. Fields' representatives that Interbake would be terminating the License Agreement

---

[171] JX 402; Tr. 1221 (Crystal).

[172] JX 408 CAS000066.

[173] *See* Tr. 1225-27, 1231-32 (Crystal); JX 415.

[174] Tr. 1265 (Crystal): JX 484, 500.

[175] Tr. 1234 (Crystal); JX 503.

[176] Tr. 1267-68 (Crystal).

under Section 15(c)(iii) because sales in 2015 had not met the specified $20 million threshold.[177] Lyman and Kipley were taken by surprise.[178] That afternoon, Reeve emailed Lyman an "annual report" containing the 2015 sales and royalty figures.[179]

Also on April 5, Mrs. Fields provided Walmart with updated packaging information for each of the products it sold Walmart, except for its Mrs. Fields products.[180] Two days later, Interbake pitched Walmart on a "great soft baked cookie" that would sell faster ("better velocities") than Mrs. Fields as part of its strategy to transition Walmart away from Mrs. Fields:

> Our goal is still to provide you with a great soft baked cookie for your customers. I will do everything I can to transition in a quality way. I want to make sure that we help you with an item that has better velocities than the current items. We can discuss options for you to lead the market in this change if you want to move first.[181]

On April 13, Walmart informed Interbake that it was "not interested in adding any other items" and had decided to discontinue selling the Mrs. Fields products.[182] Andrew Hotchkiss, an Interbake account manager, attributed Walmart's

---

[177] Tr. 1296 (Lyman).

[178] Tr. 1296-97 (Lyman).

[179] JX 712.

[180] JX 537.

[181] JX 537 IBF00016533; *see also* JX 542 IBF00016655-56.

[182] JX 542 IBF00016655.

discontinuance of Mrs. Fields to Interbake's decision to exit from the Mrs. Fields relationship and the timing of Walmart's resetting of its "modulars."[183]

After giving Mrs. Fields notice of its intention to terminate the License Agreement, Interbake prepared to launch a new partnership with Back to Nature. On April 6, Interbake held a three-hour "Kick-Off Call" with Back to Nature, before which Interbake circulated a presentation deck containing slides for fourteen of its major retailers.[184] The slides displayed the Mrs. Fields logo along with the logo of each retailer and contained information Interbake had compiled during its tenure as licensee of each retailer's recent sales of Mrs. Fields cookies.[185]

On April 12, Gormley emailed Lyman a copy of Interbake's written notice of termination, "effective immediately, pursuant to Section 15(c)(iii) of the License Agreement."[186] Interbake offered to "work with [Mrs. Fields] to ensure an orderly transition of the Mrs. Fields arrangements."[187] On April 13, Mrs. Fields filed this lawsuit and, a few days later, sought a temporary restraining order to prevent Interbake from taking any action to terminate the License Agreement. On April 18,

---

[183] JX 551 BTN001405; *see also* JX 547. A "modular" is a preplanned store arrangement that is used across store locations and is reset after a given period, in this case annually. *See* JX 4 at 309-10 (Gormley Dep.); JX 14 at 162 (Courtney Dep.).

[184] JX 616.

[185] JX 616.

[186] JX 538.

[187] JX 538.

2016, the Court entered a Standstill Order to which the parties stipulated. It provides "that neither Mrs. Fields nor Interbake shall take any action to implement any termination of the License Agreement" and that the parties would "continue to honor and meet their respective obligations under the License Agreement" until the Court issues a ruling after trial.[188]

On May 4, 2016, Gormley sent Lyman a letter providing Interbake's "point of view" concerning its failed relationship with Mrs. Fields.[189] The letter asserted that "Mrs. Fields' brand health has continued to decline since February 2013, despite significant investment and effort by Interbake to drive and build the brand."[190] It further asserted that the business had become "commercially unviable" for Interbake, thus warranting termination under Section 15(c)(ix) "in addition to [its] right to terminate for sales coming in less than $20 million annually under Section 15(c)(iii) of the License Agreement."[191]

The initiation of litigation by Mrs. Fields disrupted Interbake's planned partnership with Back to Nature. On May 26, Gormley wrote Fantegrossi

---

[188] JX 32 ¶¶ 2-3.

[189] JX 569 MF00020865.

[190] JX 569 MF00020866.

[191] JX 569 MF00020867.

referencing the litigation and putting on hold "expanding [its] relationship" with Back to Nature.[192]

In April and May, Interbake continued to experience shortages of various Mrs. Fields products, including its milk chocolate chip cookie, prompting complaints from customers.[193] According to Rummel, Interbake's director of sales, Interbake had "corrected the packaging situation at this point," which was a key reason for its inability to fill all product orders, but the shortages continued due to "backlog on the product."[194]

## Q. Sales from 2013 to 2016

The License Agreement was signed in March 2012, and Interbake assumed operational control of branded retails products in or about November 2012. For the four full calendar years on Interbake's watch, the trial record reflects that the volume of Mrs. Fields product sales rose modestly from 2013 to 2014, and then declined significantly in 2015 and again in 2016, while the amount of trade spend Interbake

---

[192] JX 593 BTN000244.

[193] *See* JX 553, JX 574, JX 577, JX 579, JX 583, JX 585.

[194] Tr. 779-80 (Rummel).

incurred as a percentage of sales increased steadily over the three years for which

data are available:

| Retail Branded Sales 2013-2016 | | | | |
|---|---|---|---|---|
| Year | Gross Sales[195] | Net Sales (98% of Gross) | Trade Spend[196] | Trade Spend (% of Gross) |
| 2013 | $22,764,278 | $22,308,992 | $4,056,725 | 17.82% |
| 2014 | $23,210,119 | $22,745,917 | $4,911,991 | 21.16% |
| 2015 | $17,006,419 | $16,596,495 | $4,110,126 | 24.17% |
| 2016 | $10,951,446 | $10,732,418 | - | - |

Despite Interbake's failure to achieve $20 million in Net Sales in 2016, Mrs.

Fields did not seek to terminate the License Agreement under Section 15(c)(iii).

## II.     THE PARTIES' CONTENTIONS

After this action was filed in April 2016, expedited discovery occurred over a

period of approximately six months, after which both parties amended their

pleadings.   On November 2, 2016, shortly before trial, Mrs. Fields filed a Verified

Amended Complaint ("Complaint") asserting four claims:

- Count I seeks a declaratory judgment that Interbake was not entitled to terminate the License Agreement under Section 15(c)(iii) and a permanent injunction requiring Interbake to continue performing under the License Agreement.

---

[195] Sales figures (rounded) come from the annual royalty reports.  JX 190 (2013); JX 276 (2014); JX 446 (2015); JX 728 (2016).  On February 23, 2017, Mrs. Fields moved to supplement the record to include JX 728.  Interbake objected to the motion but offered to stipulate to the gross sales figure included in the chart above.

[196] JX 39 (Expert Report of Vincent A. Thomas) at 14.

- Count II seeks injunctive relief and specific performance for Interbake's alleged breaches of certain provisions of the License Agreement.

- Count III seeks damages for Interbake's alleged breaches of various provisions of the License Agreement.

- Count IV seeks damages for Interbake's alleged breach of the implied covenant of good faith and fair dealing.

On November 4, 2016, Interbake filed amended counterclaims (the "Counterclaim"),

asserting three claims:

- Count I seeks a declaratory judgment that Interbake was entitled to terminate the License Agreement under Section 15(c)(iii) as well as Section 15(c)(ix).

- Count II seeks rescission of the License Agreement and damages for Mrs. Fields' alleged breach of express and implied terms of the License Agreement.

- Count III seeks rescission of the License Agreement on the theory that Mrs. Fields fraudulently induced Interbake to enter into the License Agreement through knowingly false and misleading representations.

Interbake did not seriously press its third counterclaim during post-trial briefing

and later abandoned it.[197]

---

[197] Post-Trial Tr. at 111-12 (Dkt. #195). The amended counterclaims added the fraudulent inducement claim (Count III) and the implied covenant claim asserted as part of Count II. Mrs. Fields objected to these additions, which were filed without leave of Court shortly before trial. That objection is moot given that Interbake abandoned Count III and that the only implied covenant claim it briefed post-trial—in a one-paragraph argument—is without merit. *See* IV.C.2 n. 307, *infra*.

## III. LEGAL STANDARD

To succeed at trial, "Plaintiffs, as well as Counterclaim-Plaintiffs, have the burden of proving each element, including damages, of each of their causes of action against each Defendant or Counterclaim-Defendant, as the case may be, by a preponderance of the evidence."[198] "Proof by a preponderance of the evidence means proof that something is more likely than not."[199] This standard applies to both Mrs. Fields' claims and Interbake's counterclaims.[200]

With certain exceptions not relevant here, the License Agreement is governed by Delaware law.[201] Under Delaware law, a "contract's express terms provide the starting point in approaching a contract dispute."[202] If, on its face, the "contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity."[203] If a contract

---

[198] *inTEAM Associates, LLC v. Heartland Payment Systems, Inc.*, 2016 WL 5660282, at *13 (Del. Ch. Sept. 30, 2016).

[199] *Id.*

[200] *Medicalgorithmics S.A. v. AMI Monitoring, Inc.*, 2016 WL 4401038, at *17 (Del. Ch. Aug. 18, 2016).

[201] JX 104 § 22(k) ("Except to the extent governed by the United States Trademark Act of 1946 . . . or other federal law, this Agreement, and the relationship between LICENSEE and MRS. FIELDS, shall be governed by the laws of the State of Delaware.").

[202] *Ostroff v. Quality Services Laboratories, Inc.*, 2007 WL 121404, at *11 (Del. Ch. Jan. 5, 2007).

[203] *GMG Capital Inv., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 783-84 (Del. 2012) (quoting *Eagle Indus., Inc. v. DeVibiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

46

is ambiguous, however, the Court may consider extrinsic evidence, including "evidence of prior agreements and communications of the parties as well as trade usage or course of dealing."[204]

Under Delaware's objective theory of contracts, "a contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[205] In considering extrinsic evidence, the Court should uphold, "to the extent possible, the reasonable shared expectations of the parties at the time of contracting."[206] "In giving effect to the parties' intentions, it is generally accepted that the parties' conduct before any controversy has arisen is given 'great weight.'"[207]

---

[204] *Eagle Indus.*, 702 A.2d at 1233.

[205] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

[206] *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 13 (Del. Ch. 2003).

[207] *Ostroff*, 2007 WL 121404, at *11; *see also Radio Corp. of Am. v. Philadelphia Storage Battery Co.*, 6 A.2d 329, 340 (Del. 1939) ("It is a familiar rule that when a contract is ambiguous, a construction given to it by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight, and will, when reasonable, be adopted and enforced by the courts. The reason underlying the rule is that it is the duty of the court to give effect to the intention of the parties where it is not wholly at variance with the correct legal interpretation of the terms of the contract, and a practical construction placed by the parties upon the instrument is the best evidence of their intention.").

## IV. ANALYSIS OF TERMINATION CLAIMS

The dispute that precipitated the filing of this action is whether Interbake was within its rights to terminate the License Agreement in April 2016, before the expiration of its initial five-year term on December 31, 2017. That issue forms the basis of the first claim in Mrs. Fields' Complaint and Interbake's Counterclaim.

In Count I of its Complaint, Mrs. Fields seeks a declaration that Interbake did not have the right to terminate the License Agreement under Section 15(c)(iii), as it purported to do in April 2016, and a permanent injunction requiring Interbake "to continue to carry out its obligations under the License Agreement until December 31, 2017 or, with appropriate advance notice, such earlier date as Mrs. Fields may reasonably select."[208] In Count I of its Counterclaims, Interbake seeks a declaration that it properly and effectively terminated the License Agreement under Sections 15(c)(iii) and 15(c)(ix),[209] which Interbake first invoked in writing as a basis for termination in April and May 2016, respectively.[210] In Count II of its Counterclaim, Interbake seeks to rescind the License Agreement based on Mrs. Fields' alleged material breaches of certain provisions in the License Agreement.[211] I address the issues concerning these purported grounds for termination, in turn, below.

---

[208] Compl. ¶ 56 (Dkt. #135).

[209] Counterclaim ¶ 141 (Dkt. #148).

[210] *See* JX 538; JX 569.

[211] Counterclaim ¶ 152 (Dkt. #148).

48

**A.** **Interbake Is Not Entitled to Terminate the License Agreement Under Section 15(c)(iii)**

Section 15(c)(iii) of the License Agreement provides for early termination should "Net Sales" fall below $20 million in any given "Contract Year:"

> (c) This Agreement may be terminated as follows:
> . . .
> (iii) Within fifteen (15) days following the receipt of the annual report pursuant to Section 7(b), if LICENSEE fails to reach Net Sales of twenty million ($20,000,000) dollars per Contract Year, during the Initial Term and Renewal Term, as the case may be.

"Net Sales" is defined to mean 98% of "Gross Sales," and the term "Contract Year" corresponds to each calendar year from January 1, 2014 forward.[212]

In April 2016, Interbake sought to terminate the License Agreement under Section 15(c)(iii) because it achieved only approximately $16.6 million in Net Sales in 2015. Interbake argues that, because Section 15(c)(iii) does not specify which party has the right to terminate, either party must be able to do so. Mrs. Fields counters that it would be unreasonable to construe Section 15(c)(iii) to give Interbake—the exclusive licensee—the ability to terminate for its own failure to reach the $20 million minimum. Having carefully considered the evidence of record, I agree with Mrs. Fields for essentially four reasons that the parties' reasonable

---

[212] JX 104 at 2-3 & Ex. A.

expectations when they entered the License Agreement was that only Mrs. Fields would be able to trigger a termination under Section 15(c)(iii).

First, the structure of the License Agreement and commercial logic support this conclusion. The License Agreement entitles Mrs. Fields to receive a "running royalty" of 9% on every dollar of Net Sales up to $28 million in Net Sales (with the royalty rate declining thereafter),[213] but it does not impose any best or reasonable efforts obligation on Interbake to achieve a certain level of sales. Indeed, at Interbake's request, a provision requiring that it achieve a minimum amount of annual sales (ranging from $20 million to $35 million from year 1 to year 5) was removed from an early draft of the License Agreement. Mrs. Fields did obtain, however, an important economic protection, namely the right to receive a minimum royalty of $2 million each year beginning with the 2014 calendar year until the end of the initial term of the License Agreement.[214] Thus, if Net Sales in a calendar year from 2014 forward do not exceed approximately $22.2 million—the point at which $2 million in running royalties would be due under a 9% royalty rate—Interbake is on the hook to make a true-up payment to Mrs. Fields for the difference.[215]

---

[213] The royalty rate changes to 3% between $28 million to $38 million, 4% between $38 million to $48 million, and 5% above $48 million. JX 104 § 4(b).

[214] JX 104 Ex. D-1. The minimum royalty due for the period ending December 31, 2013, which included part of 2012, was $2.5 million.

[215] *See* JX 107 IBF00042242 ("Guaranteed annual minimum royalty of $2.0MM (9% of $22.2MM of revenue)").

Given this structure, it makes little commercial sense to think the parties would have intended that Interbake could terminate the License Agreement early *due to its own failure* to achieve the $20 million minimum sales threshold and thereby relieve itself of its minimum annual royalty obligation.[216]  In interpreting a contract, Delaware courts seek to "give each provision and term effect . . . .  We will not read a contract to render a provision or term meaningless or illusory."[217] Interpreting Section 15(c)(iii) to apply reciprocally would negate the purpose of the minimum annual royalty provision because Interbake could avoid the obligation to pay the minimum royalty each year for the rest of the license term if it failed to achieve $20 million in Net Sales in 2014, 2015 or 2016.

Second, construing Section 15(c)(iii) to be exercisable only by Mrs. Fields is supported by the text of Section 15(d)(iv).  That provision relieves Interbake of any "further financial obligation" apart from royalties that already have accrued for a termination under Section 15(c)(iii) "by Mrs. Fields:"

> Following the termination *by MRS. FIELDS pursuant to Section 15(c)(iii)*, the expiration of this Agreement or the earlier termination by LICENSEE as set forth herein, LICENSEE shall have no further

---

[216] *See* JX 104 § 15(d)(iv) ("The parties explicitly acknowledge and agree that nothing herein grants a right to MRS. FIELDS to the Guaranteed Minimum Royalties in the event of an early termination of this Agreement.  LICENSEE agrees to pay all Guaranteed Minimum Royalties that have accrued prior to termination, and to pay a pro-rata calculation of Guaranteed Minimum Royalties during the year in which the termination notice is provided.").

[217] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (internal quotations omitted).

> financial obligations of any kind hereunder other than the payment of
> Running Royalties which accrued prior to the expiration or termination
> ….

"Contracts must be construed as a whole,"[218] and courts will take into account "not only the language of the provision itself, but also the context of this provision within the overall framework of the [contract]. The trial court [thus] consider[s] the purpose of the [provision], as evidenced by its text, as well as other provisions relating to the [same subject]."[219] If the parties had intended that Interbake could trigger a termination under Section 15(c)(iii), it is reasonable to assume they would have said so when referring to that specific provision in Section 15(d)(iv). They did not, which strongly suggests that they did not intend to afford Interbake this right and which is consistent with the commercially logical result of ensuring that Interbake cannot use Section 15(c)(iii) to avoid its minimum annual royalty obligation.

Third, the negotiation history of the License Agreement confirms that Section 15(c)(iii) was not intended to apply reciprocally. It was Mrs. Fields—not Interbake—that inserted the original version of Section 15(c)(iii) into the first draft of the License Agreement.[220] Specifically, using as a template its preexisting license with Unilever, which did not contain a provision similar to Section 15(c)(iii), Mrs.

---

[218] *Nw. Nat. Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996).

[219] *Salamone v. Gorman*, 106 A.3d 354, 372 (Del. 2014).

[220] *See* I.C., *supra.*

Fields added the first version of Section 15(c)(iii), which referred to a $25 million minimum sales threshold.[221]  Monette of Interbake thereafter asked Courtney of Mrs. Fields to "reduce it to 20 million," which Mrs. Fields agreed to do.[222]  It would make no sense for Interbake to ask that the threshold be reduced if, as Interbake now contends, the provision was intended as downside protection for its benefit.

Fourth, contemporaneous evidence demonstrates that Interbake understood when it signed the License Agreement that only Mrs. Fields had the right to trigger a termination under Section 15(c)(iii).  This is reflected in an internal Interbake memorandum dated March 21, 2012—two days before the License Agreement was signed—that was prepared to obtain authorization for expenditures related to entering into the license.  Summarizing the termination provisions of the License Agreement, the memorandum states:

- Mrs. Fields has right to terminate where net sales [are] less than $20M in any contract year.
- Interbake has the right to terminate where Mrs. Fields materially changes the program or damages the brand such that the arrangement becomes commercially unviable."[223]

---

[221] The original provision contained an apparent typographical error because it confusingly referred to both $20 million and $25 million in setting the threshold.  *See* I.C. n. 26, *supra.* Nonetheless, concerned about the prospect of a $25 million sales minimum, Interbake asked that the minimum be reduced to $20 million.

[222] Tr. 47-48 (Courtney); JX 89 at § 15(c)(iii).

[223] JX 107 IBF00042252.  The question of whether this summary and subsequent documents incorporating it are privileged was the subject of a motion to compel that the Court granted after finding that Interbake had selectively waived privilege.  Mot. to Compel Tr. at 93-94 (Dkt. #161).

The same understanding of the parties' termination rights was incorporated into several other slide decks that were circulated internally at Interbake and the Weston entities, some as recently as May 2014.[224]

For its part, Interbake argues that Section 15(c)(iii) was intended to operate for its benefit based on Monette's testimony that he asked Courtney during the license negotiations for "downside protection" if the deal "didn't work out."[225] There is no parol evidence in the record, however, reflecting any discussions *between the parties* over the specific issue of whether Section 15(c)(iii) was intended to operate reciprocally.[226] Monette's testimony about "downside protection" was vague and never expressly connected to what became Section 15(c)(iii).[227] Based on the clear weight of the evidence, I find that the "downside protection" Interbake requested during the negotiations was provided in the form of Section 15(c)(ix), which logically focuses on the conduct of Mrs. Fields as grounds for termination by Interbake, and not in the form of Section 15(c)(iii).[228]

---

[224] *See* JX 110 at 3 (March 28, 2012 slide deck); JX 209 at 8 (May 16, 2014 draft slide deck); JX 213 at 9 (May 21, 2014 draft slide deck).

[225] Tr. 1091 (Dkt. #170) (Monette).

[226] *See* I.C., *supra.*

[227] Tr. 1090-91 (Monette).

[228] Tr. 956 (McDonough) ("Q. Was there any other provision that was included in the agreement, in your estimation, to address this downside protection? A. Yeah. In 15(e)(ix), I believe it was.") Section 15(e)(ix) of an early draft became Section 15(c)(ix) in the final License Agreement. *See* I.C., *supra.*

In sum, for the reasons stated above, Mrs. Fields is entitled to a declaration that Interbake did not have the right to terminate the License Agreement under Section 15(c)(iii), as it purported to do in April 2016.[229]

## B. Interbake's Purported Termination Under Section 15(c)(ix) Was Invalid

Section 15(c)(ix) of the License Agreement states, in relevant part:

> If MRS. FIELDS (i) has made a representation or warranty in this Agreement that was not correct in any material respect at the time it was given; . . . or (iii) materially damages the value of the Licensed Names and Marks or the goodwill associated therewith, that directly renders the performance of this Agreement by LICENSEE commercially unviable (including but not limited to, a change that materially changes the market for the Royalty Bearing Products and/or materially changes the cost structure of the Royalty Bearing Products)(each a "Material Program Change"), then this Agreement may be terminated upon thirty (30) days written notice to MRS. FIELDS, without prejudice to any and all other rights and remedies LICENSEE may have hereunder or by law provided.

The first time Interbake invoked Section 15(c)(ix) in writing as a ground for termination was in a letter dated May 4, 2016, three weeks after Mrs. Fields filed this lawsuit.[230] Interbake relies specifically on the first and third subsections of Section 15(c)(ix), quoted above, which I address in that order.[231]

---

[229] Because Interbake's purported termination under Section 15(c)(iii) was invalid, it is not necessary to decide whether Interbake complied with the requirement in that provision that the termination occur within "fifteen (15) days following the receipt of the annual report pursuant to Section 7(b)."

[230] JX 569.

[231] Relying on this Court's decision in *U.S. Bank Nat. Ass'n v. U.S. Timberlands Klamath Falls, L.L.C.,* 2004 WL 1699057 (Del. Ch. July 29, 2004), Mrs. Fields argues that Interbake

### 1. Interbake's Purported Termination Under the First Subsection of Section 15(c)(ix) Was Invalid

The first subsection of Section 15(c)(ix) permits Interbake to terminate the License Agreement "[i]f MRS. FIELDS (i) has made a representation or warranty in this Agreement that was not correct in any material respect at the time it was given." Interbake contends that it was entitled to terminate the License Agreement under this provision on the theory that Mrs. Fields falsely represented in Section 19(d) of the License Agreement that it had no knowledge when it entered into the agreement of any fact or occurrence that was or could become materially adverse to Mrs. Fields' business:

> (d) **Absence of Certain Changes, Events and Conditions.** MRS. FIELDS represents and warrants that it has no knowledge of any event, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (a) the business, prospects, condition (financial or otherwise) or assets of MRS. FIELDS, its goodwill, or Licensed Names and Marks, (b) the value or marketability of the Royalty Bearing Products, or (c) the ability of LICENSEE to consummate the transactions contemplated hereby, including but not limited to changes in the current customer base, knowledge of an impending or threatened loss of a material

---

failed to comply with the 30-day notice provision in Section 15(c)(ix) because it filed a counterclaim seeking termination under that provision on May 6, only two days after providing its written notice on May 4. The notice requirement in *Timberlands*, however, expressly was intended to provide a 60-day cure period before an event of default could arise under a trust indenture. *Id.* at *3. By contrast, the 30-day period in Section 15(c)(ix) does not operate as a cure period but as the effective date for a termination, the ostensible purpose of which is to afford Mrs. Fields thirty days to transition the licensed business once a notice of termination is provided. Thus, there was no breach of the notice provision for failure to wait until the expiration of the cure period to file suit.

customer, and/or material changes to the Designated Distribution Channels.

The crux of this claim rests on what constitutes a "materially adverse" "event, occurrence, fact, condition or change," which Section 19(d) does not define and for which the parties offered no parol evidence.

### a. Defining "Materially Adverse"

Mrs. Fields analogizes Section 19(d) to "material adverse change" or "effect" clauses ("MAC" or "MAE" clauses) that are a routine fixture in merger agreements, which this Court has analyzed on a number of occasions.[232] Citing this Court's 2005 decision in *Frontier Oil v. Holly Corp.*, Mrs. Fields asserts that a "materially adverse" "event, occurrence, fact, condition or change" must be something that would "substantially threaten the overall earnings potential of the target company in a durationally significant manner," and that none of the purported facts that Interbake relies on satisfies that standard.[233]

Interbake counters that *Frontier Oil* is inapt because the License Agreement is not a merger or acquisition agreement but rather a trademark license agreement, but it offers no alternative reading of the text of Section 19(d). Interbake simply

---

[232] *See, e.g.*, *Hexion Specialty Chemicals, Inc. v. Huntsman Corp.*, 965 A.2d 715 (Del. Ch. 2008); *Frontier Oil v. Holly Corp.*, 2005 WL 1039027 (Apr. 29, 2005); *In re IBP, Inc. Shareholders Litigation*, 789 A.2d 14 (Del. Ch. 2001) (Strine, V.C.).

[233] Pl.'s Ans. Br. at 39-41 (Dkt. #183).

observes that the provision does not contain any durational element or requirement that the alleged "materially adverse" fact threaten "overall earnings potential." Interbake further notes that Section 19(d) is an inclusive representation also meant to cover an event that "is *or could reasonably be expected to become* materially adverse."[234]

In my opinion, the test in *Frontier Oil* provides an appropriate framework to analyze whether Mrs. Fields breached Section 19(d). In *In re IBP, Inc. Shareholders Litigation*,[235] which is the origin of the *Frontier Oil* test,[236] Chief Justice Strine, writing as a Vice Chancellor, interpreted an MAE clause that, like Section 19(d), functioned as a representation and warranty that the seller had not suffered a "material adverse effect," and which defined that concept in similar terms as:

> any event, occurrence or development of a state of circumstances or facts which has had or reasonably could be expected to have a Material Adverse Effect . . . on the condition (financial or otherwise), business, assets, liabilities or results of operations of [the seller] and [its] subsidiaries taken as whole.[237]

---

[234] Def.'s Rep. Br. at 8 (Dkt. #186) (emphasis in original).

[235] *See IBP*, 789 A.2d 14.

[236] *Frontier Oil*, 2005 WL 1039027, at *34. *IBP* was decided under New York law, but *Frontier Oil* confirmed that the same standard applies under Delaware law. *Id.*

[237] *IBP*, 789 A.2d at 65.

Based on a careful analysis of the purpose of such a clause, Chief Justice Strine articulated a three-part framework for determining when such a provision is triggered:

> [E]ven where a Material Adverse Effect condition is as broadly written as the one in the Merger Agreement, that provision is best read as a backstop protecting the acquiror from [1] the occurrence of unknown events that [2] substantially threaten the overall earnings potential of the target in [3] a durationally-significant manner. A short-term hiccup in earnings would not suffice; rather the Material Adverse Effect should be material when viewed from the longer-term perspective of a reasonable acquiror.[238]

In 2008, Vice Chancellor Lamb analyzed a similar MAE clause and similarly held: "The important consideration therefore is whether there has been adverse change in the target's business that is consequential to the company's long-term earnings power over a commercially reasonable period."[239] He further emphasized that a party "faces a heavy burden when it attempts to invoke a material adverse effect clause in order to avoid its [contractual] obligation."[240]

Although the License Agreement did not involve a merger or acquisition, its drafters in 2012 had the benefit of the doctrine developed in *IBP* and its progeny when they negotiated the text of Section 19(d). More importantly, the same factors underlying its approach—knowledge, magnitude, and duration—are relevant to

---

[238] *Id.*

[239] *Hexion*, 965 A.2d at 738.

[240] *Id.*

construing Section 19(d) in my view, although, as discussed below, the reasonable expectations of licensees and licensors would not necessarily be the same for buyers and sellers of a business insofar as the durational factor is concerned.

Beginning with knowledge, Interbake could not reasonably have expected when it entered the License Agreement that it would be able to terminate it on the basis of an adverse fact it knew about and yet ignored.[241] If the fact or occurrence in question were within the parties' contemplation, they presumably would have specifically addressed it in the License Agreement. Put differently, if Interbake entered into the contract despite knowledge of an adverse fact, then it would be reasonable to assume it either considered the fact to be immaterial or decided to assume the risk.[242] Allowing Interbake to terminate the License Agreement based on something it knew about at the outset would be tantamount to building into the agreement an at-will termination mechanism that would vitiate Mrs. Fields' rights under the contract, including its right to collect the minimum royalty.

---

[241] *See* Y. Carson Zhou, *Material Adverse Effects as Buyer-Friendly Standard*, 91 N.Y.U. L. Rev. Online 171, 175-79 (2016), http://www.nyulawreview.org/sites/default/files/ NYULawReviewOnline-91-Zhou.pdf (arguing that the MAE inquiry is derived from principles of contractual interpretation in order to assess the reasonable acquiror's intended risk allocation *ex ante*, and that a major factor in the outcomes of *Hexion* and *IBP* was that the sellers in those cases contemplated the risk of the adverse occurrences that ultimately came to pass, yet agreed to the transactions anyway with their eyes wide open).

[242] *See IBP*, 789 A.2d at 68 ("In large measure, the resolution of the parties' arguments turns on a difficult policy question. In what direction does the burden of this sort of uncertainty fall: on an acquiror or on the seller?").

As to magnitude, it is reasonable to infer that Mrs. Fields would not have agreed to Section 19(d) if Interbake could terminate on the basis of a minor setback. Common sense and commercial reality suggest that any ground for termination of a license to operate a business should "substantially threaten" the "overall earnings potential" of that business.

Finally, as to duration, short-term setbacks are a part of business; "the important thing is whether the company has suffered a Material Adverse Effect . . . that is consequential to the company's earnings power over a commercially reasonable period."[243] In an acquisition, where the buyer acquires the assets of a business outright and the cash flows they generate in perpetuity, "one would think" that a commercially reasonable period "would be measured in years rather than months."[244] The License Agreement is different. Mrs. Fields retained ownership of the brand and Interbake's interest in the business only extends until the license expires, which occurs after a five-year term, subject to an option to renew the license for another five years.[245] Thus, given the limited duration of the License Agreement, the period of time that would be "commercially reasonable" in determining whether

[243] *Id.* at 67.

[244] *Id.; see also Hexion*, 965 A.2d at 738 ("it means that for such a decline to constitute a material adverse effect, poor earnings results must be expected to persist significantly into the future.").

[245] JX 104 § 15(a)-(b).

a consequential decline in earnings has had a material adverse effect on the license presumably would be shorter than the period of time relevant to the acquisition of business.

With the foregoing considerations in mind, I now assess whether the facts and occurrences Interbake has identified satisfy the MAE requirement in Section 19(d) of the License Agreement.

### b. Interbake Has Not Proven that Mrs. Fields Had Knowledge of a Materially Adverse Fact or Event When It Entered the License Agreement

The crux of Interbake's MAE theory is essentially twofold: that Mrs. Fields knew when it entered into the License Agreement (1) that its retail cookies tasted awful, and (2) that the value of the Mrs. Fields brand was declining because of a broken franchise model and lack of investment, which impaired Interbake's sales by depressing sales velocity and elevating trade-spend requirements.[246]

Section 19(d) is a representation of Mrs. Fields's knowledge only as of the date it entered into the License Agreement on March 16, 2012. Interbake relies heavily on a November 2012 internal Mrs. Fields presentation stating that "Mrs. Fields needs revitalizing" and that the "Mrs. Fields brand has not been addressed in

---

[246] Def.'s Op. Br. at 27 (Dkt. #180); *see also* Post-Trial Tr. at 112-13 (Dkt. #195) ("there's a critical problem with the formulation of the cookies and there's a critical problem in terms of branding . . . the second issue . . . is this notion that they haven't invested in the brand in over a decade.").

over 10 years,"[247] but that presentation postdates the Section 19(d) representation by eight months. The presentation, moreover, was not intended to suggest that Mrs. Fields had not been regularly incurring marketing expenditures to support the brand. As Mrs. Fields' then-CEO (Casey) explained, the presentation was referring to "investment outside the traditional marketing expenditures that hit the P&L," which Mrs. Fields had been incurring in the normal course to "support the brand."[248]

Interbake's best evidence pre-dating the License Agreement consists of (1) a September 2011 Mrs. Fields board presentation stating that the price of its retail cookies had "realistically hit the 'ceiling'" and describing the need to improve product quality "to be more consistent with MF brand expectations;"[249] (2) a January 2012 board presentation in which Mrs. Fields acknowledged that the "current BRG [Branded Retail Group] product does not meet the Mrs. Fields cookie standard or consumer expectation impacting repeat purchase and overall velocity;"[250] (3) a February 2012 email where Courtney called the franchising model "broken," to which Casey responded, "we have to fix quality in all three channels—it's our brand;"[251] and (4) a March 2, 2012 email identifying the need to "reformulate the

---

[247] JX 134 ZC003122.

[248] JX 134 ZC003100.JX 12 at 112-13 (Casey Dep.).

[249] JX 66 at 2.

[250] JX 76 at 3.

[251] JX 78 MF00011037.

recipe of the cookies in all three channels" as a key initiative for 2012 and explaining that recipe reformation for branded retail products is "less of a priority as a licensing partner is pursued."[252] This evidence, considered in the aggregate, falls short in my opinion of evidencing a "materially adverse" "event, occurrence, fact, condition or change" under Section 19(d).

Awful taste does not qualify as a material adverse fact or event within the meaning of Section 19(d) because the retail branded cookies were openly available on store shelves. Interbake thus had ample opportunity to test the quality of the Mrs. Fields cookies (and it is hard to imagine it did not) before deciding to enter into the License Agreement. Mrs. Fields also expressly disclosed to Interbake in a February 16, 2012 due diligence presentation—one month before the License Agreement was signed—that it was "missing the mark today" on aligning quality "with consumer expectations across all channels."[253] And contrary to Interbake's contentions that "sky-rocketing trade spend" and "slow sales velocity" was "covered up by MSF,"[254] Mrs. Fields provided Interbake during due diligence with detailed financial

---

[252] JX 98 DB000284.

[253] JX 96 IBF582000.

[254] Def.'s Op. Br. at 27 (Dkt. #180).

information, including actual sales and trade spend figures for 2009, 2010 and most of 2011.[255] Interbake has never contested the accuracy of any of those figures.[256]

As for brand decline, any inference of a material adverse effect as of the date of the License Agreement is undermined by Interbake's own statements and conduct. In February 2012, Kevin McDonough described Mrs. Fields as an "iconic brand" and a "leading cookie brand that has high brand recognition and opportunity for growth."[257] Between January 2013 and May 2015, Interbake made repeated offers to purchase what it characterized in April 2015 as a "strong brand . . . that has the potential for long-term success."[258] Interbake's assertion that Mrs. Fields concealed from it a material brand decline seems highly pretextual given the striking fact that Interbake repeatedly tried to acquire the brand for more than two years, during which time it was operating the retail cookie business and had first-hand knowledge of the brand's strength. A reasonable licensee would not have been so ardent in its overtures if that experience indicated a brand impairment that substantially threatened overall earnings potential.

Reinforcing the pretextual flavor of its reliance on Section 19(d) as a basis for termination ***more than three years*** after signing the License Agreement, Interbake

---

[255] JX 70; *see also* JX 92.

[256] Tr. 1132 (Monette).

[257] JX 97 IBF00045415.

[258] JX 288 at 12.

did not identify Section 15(d)(ix) as a basis for termination in its April 12, 2016 "Notice of Termination," did not articulate an MAE theory in its May 4, 2016 letter supplementing its initial termination notice, and the alleged misrepresentations it did identify in its May 4 letter were effectively abandoned by the time of trial.[259] Paraphrasing *IBP*, the "post-hoc nature of [Interbake's] arguments bear on what it felt the contract meant when contracting, and suggests that [the alleged decline of the Mrs. Fields brand] would not be sufficient to cause an MAE."[260]

Finally, pointing to a series of statements in a presentation Mrs. Fields prepared for Interbake in February 2012, quoted below, Interbake asserts that it "never would have entered into the [License] Agreement had it known the truth:"

- "Our brand attracts the best franchisees because we give them the best support and the best economic model."

---

[259] *Compare* JX 569 MF00020867 (May 4 notice) (alleging a gross sales discrepancy, failure to disclose a client retention expenditure, and the impending loss of certain customers), *with* Def.'s Op. Br. at 27 (Dkt. #180) ("a dying brand, a failed franchise model, sky-rocketing trade spend, slow sales velocity, and poor-tasting cookies").

At pages 36-37 of its reply brief, Interbake mentions one subject that was referenced in the May 4 letter concerning the loss of CVS as a customer, which occurred in 2013. JX 569 MF00020867. Interbake has provided no evidence, however, that Mrs. Fields knew when it entered the License Agreement in March 2012 that its retail business with CVS was in real jeopardy. Interbake's earliest evidence concerning the potential loss of CVS consists of minutes of an August 15, 2012 Mrs. Fields board meeting, which stated: "Product performance at CVS and Shopper's Drug Mart are both declining. A discussion ensued regarding causes and effects of the downturn and problems with Shopper's Drug Mart and CVS." JX 118 ZC002279; *see also* Post-Trial Tr. at 119 (Dkt. #195). Nothing in these minutes, which post-date the License Agreement by approximately five months, indicates that the loss of CVS as a customer was impending or threatened as of March 16, 2012.

[260] *IBP*, 789 A.2d at 65.

66

- The Mrs. Fields brand is "on trend" and "still resonates with consumers."

- "We will build and support our brands because they are the reason we are here in the first place."

- "We will always maintain the integrity and taste or our current recipes, and when we create new concoctions, they will be every bit as delicious as the tastes that made us famous."[261]

These statements amount to vague expressions of self-praise or "puffery" that Interbake could not reasonably have relied on as a matter of law,[262] and the same presentation also stated that Mrs. Fields was "missing the mark today" on aligning quality "with consumer expectations across all channels."[263]

In sum, for the reasons explained above, Interbake has failed to prove by a preponderance of the evidence that Mrs. Fields breached Section 19(d). Accordingly, Interbake was not entitled to terminate the License Agreement under the first subsection of Section 15(c)(ix).

---

[261] Def.'s Op. Br. at 28 (Dkt. #180); JX 96 IBF00058194.

[262] *Airborne Health, Inc. v. Squid Soap, LP*, 2010 WL 2836391, at *8 (Del. Ch. July 20, 2010) ("Puffery is a 'vague statement' boosting the appeal of a service or product that, because of its vagueness and unreliability, is immunized from regulation.") (quoting David A. Hoffman, *The Best Puffery Article Ever,* 91 Iowa L. Rev. 1395, 1397 (2006)); *see also Solow v. Aspect Res.,* LLC, 2004 WL 2694916, at *3 (Del. Ch. Oct. 19, 2004) (Under Delaware law, a company's optimistic statements praising its own "skills, experience, and resources" are "mere puffery and cannot form the basis for a fraud claim.").

[263] JX 96 IBF582000.

## 2. Interbake's Purported Termination Under the Third Subsection of Section 15(c)(ix) Was Invalid.

The third subsection of Section 15(c)(ix) states that Interbake may terminate the License Agreement under the following circumstances:

> If MRS. FIELDS … (iii) materially damages the value of the Licensed Names and Marks or the goodwill associated therewith, that directly renders the performance of this Agreement by LICENSEE commercially unviable (including but not limited to, a change that materially changes the market for Royalty Bearing Products and/or materially changes the cost structure of the Royalty Bearing Products) (each a "Material Program Change") . . . .

Interbake argues that Mrs. Fields' "failure to support the brand" made its performance "commercially unviable."[264]

As an initial matter, the text of Section 15(c)(ix)(i) strongly suggests that the predicate for it to apply is the taking of some affirmative action by Mrs. Fields after the license began—such as the implementation of a "Material Program Change"—that rendered Interbake's performance "commercially unviable." But Interbake has not offered any evidence that Mrs. Fields took affirmative action that "[d]amaged the value of the Licensed Names and Marks or the goodwill associated therewith," and relies instead on evidence of passive neglect, *i.e.*, that Mrs. Fields continued to neglect its brand during the license term as it had for years before by not investing

---

[264] Def.'s Op. Br. at 37 (Dkt. #180).

in the brand. For this reason alone, Interbake has failed to establish a breach of Section 15(c)(ix)(i).

Interbake also has failed to prove that its performance of the Agreement has become "commercially unviable." Although the term is undefined, and the parties have provided no authorities to assist with its interpretation, the gravity of a provision permitting Interbake to walk away from its contractual obligations suggests that "commercially unviable" should amount to a loss of some significance in both magnitude and duration. In other words, the *IBP* reasoning is as applicable here as it is in the MAE context: "it is odd to think that a strategic [licensee] would view a short-term blip in earnings as material, so long as the [license's] earnings-generating potential is not materially affected by that blip or the blip's cause."[265]

Interbake contends that the branded retail business had "become unprofitable, and thus not commercially viable, at least by the beginning of 2016" due to lower sales and increased promotional costs it incurred due to Mrs. Fields' "failure to support the brand."[266] In support of this contention, Interbake relies on two financial spreadsheets (JX 644 and JX 645) known as "F9 reports" reflecting that Interbake suffered a "segment contribution" loss in the amount of $31,831 for 2015 and $1,681,989 for the first sixteen weeks of 2016, and the fact that its gross sales in

---

[265] *IBP*, 789 A.2d at 67.
[266] Def's Op. Br. at 37 (Dkt. #180).

69

2016 were just $11 million.[267] This evidence is insufficient to prove "commercial unviability" for several reasons.

To start, I have no confidence in the reliability of the F9 reports for purposes of reaching any conclusions about the profitability of the Mrs. Fields business at any given moment, much less to determine if the earnings potential of the business had deteriorated materially in a durationally significant manner. The F9 reports were available in early 2016, but were not produced to Mrs. Fields until September 2016, just two weeks before the fact discovery deadline.[268] Thus, Mrs. Fields was deprived of the opportunity to take meaningful discovery to test their reliability before trial, and unfairly hamstrung in its ability to cross-examine witnesses about them at trial.

The testimony Interbake elicited concerning the F9 reports during trial only increased my concerns over their reliability. Tiffany Reeve, who served at various times as a controller, director of accounting and Vice President of Finance at Interbake, explained that she historically had prepared P&L reports for the Mrs.

---

[267] Mrs. Fields objected to the admissibility of the F9 reports under Delaware Rules of Evidence 802 (hearsay); 901 (authentication); and 1002 (best evidence rule). Pl.'s Ans. Br. at 17 (Dkt. #183). These objections are overruled because the documents were authenticated as business records under Rule 803(6), *see* Tr. 292-93 (Gormley); Tr. 1723 (Reeve), and because Rule 1001(3) provides that "if data are stored in a computer or similar device, any printout or other output readable by sight, shown to reflect the data accurately, is an 'original'" that satisfies Rule 1002. Nevertheless, I place no weight on the documents given my concerns regarding their reliability for the reasons explained above.

[268] Tr. 1732-33 (Reeve); Tr. 1735 (Interbake's counsel).

70

Fields business manually.[269]  She described "F9" as a financial reporting tool to generate reports from the general ledger:  "You define the rules that you want to use in order to build a P&L."[270]

The F9 reports that were "built" here used mixed currencies (U.S. and Canadian dollars) and allocated costs differently from Reeve's previous manual P&L's,[271] which caused the Mrs. Fields business that Interbake previously considered to be profitable to now appear to be unprofitable.  As Gormley testified:

> THE COURT:  So you run these reports and you see, I guess in this case, for this report, for 2014, where you previously thought you were profitable, now you're negative a million 3 or thereabouts.  Is that right?
> THE WITNESS:  That's right.
> THE COURT:  Similarly for 2015.  Right?
> THE WITNESS:  Right …[272]

Gormley's testimony is particularly remarkable given that Interbake previously focused on the 2014 results for Mrs. Fields—which were characterized in an April 2015 presentation as "the highest margin business in Interbake (excluding NDS)"—as a reason to submit a $50 million bid to acquire Mrs. Fields' branded retail business and its e-commerce platform and gifting business.[273]  Significantly, furthermore,

---

[269] Tr. 1716-17, 1740 (Reeve).

[270] Tr. 1723 (Reeve).

[271] Tr. 1728, 1753-54 (Reeve); *see also* Tr. 287-92 (Gormley).

[272] Tr. 289 (Gormley)

[273] JX 300 at 5; JX 305.

Reeve credibly testified in response to the Court's question that her manual P&L's provided "a more accurate representation of allocating appropriately for Mrs. Fields" in her opinion than the F9 reports.[274]

The F9 report for the first sixteen weeks of 2016—Interbake's strongest evidence that it allegedly was incurring significant losses—also raises more questions than it answers on its face. Over 80% of the sixteen week segment loss reflected in that report ($1.35 million out of $1.68 million) is attributable to the first four weeks of the year, during which sales were reported to be negative by approximately $10,000, apparently due to the fact that trade spend exceeded the amount of gross sales by that amount.[275] No fact or expert witness provided any explanation or context about this subject or any other details concerning the F9 report, such as why trade spend would exceed sales during the first four weeks of 2016, whether such an event was a one-time blip, or whether Interbake's own actions contributed to the poor results during the first sixteen weeks of 2016 when it pursued a backfill strategy in the hope of transitioning out of the license that year. It is not disputed that sales for 2016 fell to approximately $11 million for the full year, but

---

[274] Tr. 1761 (Reeve).

[275] JX 645.

there are no profit figures in the record for the full year.[276]  Notably, Interbake did not even proffer an expert opinion on the issue of commercial unviability.

It may be true that the Mrs. Fields business became "commercially unviable" for Interbake at some point, perhaps by the end of 2016.  But Interbake failed to provide any reliable evidence at trial from which I could reach such a conclusion, and it failed to identify any change that Mrs. Fields implemented or any other affirmative action Mrs. Fields took to cause that result.  For these two independent reasons, Interbake failed to establish a breach of Section 15(c)(ix)(iii).

### C.  Interbake Failed to Prove a Material Breach of the License Agreement to Excuse Further Performance

Interbake contends that, independent of the right to terminate the License Agreement under its termination provisions, Interbake is entitled to terminate the contract under Delaware law because Mrs. Fields materially breached Sections 10(a), 19(c) and 19(d).  The previous section concluded that Interbake failed to prove that Mrs. Fields breached Section 19(d).  This section addresses whether Interbake has proven that Mrs. Fields materially breached Section 10(a) or 19(c).

---

[276] Def.'s Opp. to Pl.'s Mot. to Supp. ¶ 4 (Dkt. #191) ("Interbake offered to stipulate that the amount of 2016 sales was $10.95 million.").

Under Delaware law, a party "is excused from performance under a contract [only] if the other party is in material breach thereof."[277] A breach is material if it goes "to the root or essence of the agreement between the parties," or "touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract."[278] "Courts in Delaware look to Section 241 of the *Restatement (Second) of Contracts* for guidance regarding materiality of a breach. That section lists the following circumstances as significant in determining materiality of a breach:"[279]

(a)     the extent to which the injured party will be deprived of the benefit which he reasonably expected;

(b)     the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(c)     the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d)     the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

---

[277] *eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, 2013 WL 5621678, at *13 (Del. Ch. Sept. 30, 2013) (internal quotations omitted).

[278] *2009 Caiola Family Trust v. PWA, LLC*, 2015 WL 6007596, at *18 (Del. Ch. Oct. 14, 2015) (internal quotations omitted), *judgment entered sub nom. Caiola Family Trust v. PWA, LLC* (Del. Ch. Oct. 14, 2015), *supplemented sub nom. 2009 Caiola Family Trust v. PWA, LLC* (Del. Ch. Feb. 3, 2016).

[279] *Medicalgorithmics*, 2016 WL 4401038, at *24 (citations omitted).

(e)     the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.[280]

### 1.     Mrs. Fields Did Not Materially Breach Section 10(a)

Interbake contends that Mrs. Fields breached Section 10(a) of the License Agreement by withdrawing its approval of Interbake's partnership with SCM Designs to sell Mrs. Fields cookies in a cookie jar. I begin by summarizing the relevant facts.

On May 20, 2014, Interbake submitted a licensing approval form (the "Approval Form") to Mrs. Fields requesting approval of "Concept Artwork" for packaging and "Online Content" for advertising concerning a "Mrs. Fields Holiday Club Pack for SCM Designs."[281] In the comments section of the Approval Form, Interbake explained that "SCM designs will be purchasing bulk packed Mrs. Fields Milk Chocolate Chip cookies (130 per box) from Interbake Foods to be repacked and sold to Sam's Club for Holiday 2014."[282] On May 28, 2014, a representative of Mrs. Fields checked a box on the Approval Form indicating that the request was "Approved with Corrections" and providing some comments about the color of the "pallet tray art."[283]

---

[280] Restatement (Second) of Contracts § 241 (1981).

[281] JX 245 IBF00031443.

[282] JX 245 IBF00031443.

[283] JX 245 IBF00031444.

In the fall of 2014, Mrs. Fields was negotiating a gift packing agreement with Modern Gourmet.[284] Around this time, the SCM cookie jar caught Mrs. Fields' attention because, while Interbake was paying royalties for the cookies it was selling to SCM, SCM was not paying royalties to Mrs. Fields for the cookie jar sales. On September 9, 2014, Stu Seltzer, Mrs. Fields' broker, reached out to Interbake to inquire about who at Mrs. Fields had approved the SCM product.[285] Seltzer was provided with a copy of the Approval Form reflecting Mrs. Fields' May 28 approval.[286]

Later on September 9, Seltzer sent Interbake an email in which he referenced Mrs. Fields' relationship with Modern Gourmet and explained that any future program with SCM would only be approved if SCM entered an agreement with Mrs. Fields to pay a royalty on the "total wholesale price" of the cookie jar product:

> . . . there's another company [Modern Gourmet] that Mrs. Fields is licensing to do gift set and gift baskets. The new licensee pays a significant royalty to Mrs. Fields based on the total price of the unit (not just the price of the cookies).

> . . . in the future [the cookie jar] will only be approved if [SCM] agrees to pay the royalty based on the total wholesale price of the item and has an agreement directly with Mrs. Fields. . . . Can you please alert SCM

---

[284] Tr. 1121 (Monette); JX 17 at 170-74 (Seltzer Dep.); JX 246.

[285] JX 245 IBF00031441.

[286] JX 245.

that they should not pursue 2015 business with Mrs. Fields unless they have an agreement with Mrs. Fields.[287]

Seltzer forwarded this email to Mrs. Fields the same day, recommending that Mrs. Fields "[t]ake control of [the] SCM deal:" "we propose that we contact SCM to explain that they must work through Mrs. Fields directly and send them an agreement ensuring they comply with Mrs. Fields rules (including ending distribution and providing a sell-off for their current product until Jan 31."[288] Seltzer later spoke with SCM, which refused to pay a royalty and decided not to use Mrs. Fields cookies for its cookie jar product.[289]

Seth Monette was not pleased with Mrs. Fields' actions, and told Seltzer on September 11 that the SCM cookie jar was "worth $1.5 [million] to Interbake."[290] Interbake nevertheless confirmed that same day that "SCM Designs will not present anything without Famous Brands Approval."[291] As a result of Seltzer's intervention on behalf of Mrs. Fields, the SCM cookie jar deal "went away."[292] Seltzer testified

---

[287] JX 247 IBF00030861. It is not clear from the record whether Modern Gourmet actually had entered a contractual relationship with Mrs. Fields by this point. *See* JX 249 MF00029107 (September 9, 2014 email recommending that Mrs. Fields "move forward with" Modern Gourmet).

[288] JX 249 MF00029107.

[289] JX 17 at 174 (Seltzer Dep.).

[290] JX 249 MF00029106; JX 17 at 174-75 (Seltzer Dep.).

[291] JX 248 IBF00030093.

[292] JX 17 at 177-78 (Seltzer Dep.).

that he ultimately was "not involved in any kind of rescinding of approval" and the record does not reflect that any formal rescission was sent.[293]

Several parts of Section 10(a) are pertinent to Interbake's claim. The provision requires Interbake to submit to Mrs. Fields "[p]rior to any sale or distribution . . . all items bearing the Licensed Names and Marks" for "advance written approval, in MRS. FIELDS' reasonable judgment, at all stages listed below:"

CONCEPT: Rough sketches or layout concepts;
PROTOTYPE: Prototypes or finished artwork; and
FINAL: Pre-production sample.

The provision further explains that "[t]he following rules shall apply to all stages of the Approval Guidelines." Section 10(a)(i) provides that "LICENSEE shall not make any use of, sell or distribute such items as listed in this Section 10(a), prior to MRS. FIELDS granting final written approval." Section 10(a)(iii) states that "MRS. FIELDS, in its sole discretion, reserves the right to reject an item approved at a prior stage if in its physical form it does not meet MRS. FIELDS' marketing standards or departs from the approved sample." Section 10(a)(viii) states that Interbake "shall not have any rights against MRS. FIELDS for damages or other remedies by reason of MRS. FIELDS' failure or refusal to grant any approval referred to in this Section 10."

---

[293] JX 17 at 180 (Seltzer Dep.).

Interbake argues that Mrs. Fields violated Section 10(a)(iii) of the License Agreement by withdrawing approval of the SCM cookie jar for reasons other than a physical deviation from "marketing standards" or a departure from the "approved sample." Mrs. Fields responds that its May 28 approval applied only to the item for the 2014 holiday season, that it did not approve a holiday item for 2015, and that Section 10(a)(viii) bars any claim against Mrs. Fields for not approving an item.

Interbake has failed to establish that Mrs. Fields breached Section 10(a) for two reasons: it is not clear from the record (1) that Interbake received a "final approval" for an SCM cookie jar product in 2014, or (2) that the SCM product under consideration for the 2015 holiday season had the same features for which Interbake did receive an approval for the 2014 holiday season. As noted above, the License Agreement requires Interbake to obtain separate approval for "all stages" of a product's development, including "final written approval." The Approval Form similarly states in bold text: "IMPORTANT NOTE: ALL PACKAGING AND PRODUCT STEPS MUST BE SUBMITTED AND APPROVED BEFORE A PRODUCT IS SHIPPED TO CUSTOMERS." The Approval Form also lists a number of steps that must be taken for obtaining approval additional to the first step

79

of providing concept artwork. These steps include providing a prototype/mock-up (Step 2), pre-production sample (Step 3), and shipping container (Step 4).[294]

Interbake did not provide evidence at trial that it ever requested, let alone received, "final written approval" from Mrs. Fields for the SCM cookie jar to be used for the 2014 holiday season. Its May 20 request only sought approval for the first step of the process for a packaging approval—the submission of concept artwork. The record does not contain any evidence that any of the other steps listed on the Approval Form for the approval of packaging were completed. Thus, it is unclear whether the May 28 approval constitutes a "final written approval" of the 2014 holiday season SCM cookie jar within the meaning of Section 10(a).

Even if one assumes that the May 28 approval did constitute a final approval under Section 10(a), Interbake did not submit any evidence that whatever SCM cookie jar product it had in mind for the 2015 holiday season would use the same artwork or the same online advertising as the one that was used for the 2014 holiday season. Section 15(a)(iii) affords Mrs. Fields the "sole discretion . . . to reject an item approved at a prior stage" if it "departs from the approved sample." Thus, Interbake has failed to establish that Mrs. Fields' directives concerning SCM were inconsistent with its right under Section 15(a)(iii) to reject something it had

---

[294] JX 245 IBF00031444.

previously approved. In that vein, it is notable that Interbake did not push back on Seltzer's directives and actually acceded to them, writing on September 11 that "SCM Designs will not present anything without Famous Brands Approval."[295]

Finally, even assuming *arguendo* that Mrs. Fields did breach Section 10(a), Interbake could not terminate the Agreement on that ground because such a breach would not be material. First, Interbake cannot argue that Mrs. Fields deprived it of a contractual benefit that Interbake could have "reasonably expected" given that the SCM cookie jar post-dates the initiation of the parties' licensor-licensee relationship by two years.[296] Second, Interbake offers no explanation as to how the magnitude of its alleged loss would defeat the object of the License Agreement so as to warrant its termination.[297] Sales of the SCM cookie jar accounted for $1.1 million, or only 4.7%, of Interbake's 2014 sales of $23.2 million.[298] If warranted, damages would

---

[295] JX 248 IBF00030093. The lack of pushback by Interbake accords with the motivation for Seltzer's intervention, which was to ensure that Mrs. Fields receives a royalty for SCM's use of Mrs. Fields' brand to promote the cookie jar itself. *See* JX 17 at 174 (Seltzer Dep.) ("So I remember talking to the SCM company and saying we'd love to have you continue doing this, I know it is an important sale for Interbake, but you are going to have to pay a royalty to Mrs. Fields because you are billing the entire thing as a Mrs. Fields cookie jar. Your sale to the consumer is happening because of the Mrs. Fields brand.").

[296] *See* Restatement (Second) of Contracts § 241(a) (1981) ("the extent to which the injured party will be deprived of the benefit which he reasonably expected" relevant to whether breach is material).

[297] *See, e.g.*, *Medicalgorithmics*, 2016 WL 4401038, at *24 (internal quotations omitted) ("The question whether the breach is of sufficient importance to justify nonperformance by the non-breaching party is one of degree.").

[298] Tr. 1121 (Monette); *see also* Tr. 1805-06 (Thomas).

be adequate to compensate Interbake for any injury.[299]  Third, Interbake's conduct belies any materiality argument.[300]  Specifically, Interbake sat on its purported contractual rights for over two years before asserting Section 10(a) as a ground for termination for the first time when it amended its Counterclaim on the eve of trial.[301]

For all the reasons stated above, Interbake failed to prove that Mrs. Fields breached Section 10(a) or that such a breach would have been material so as to excuse Interbake's further performance under the License Agreement.

## 2. Mrs. Fields Did Not Materially Breach Section 19(c)

Interbake asserts that Mrs. Fields materially breached its covenant in Section 19(c) "to continue to support the brand through advertising and marketing efforts consistent with past practice."  Under its plain meaning, this covenant requires that Mrs. Fields undertake marketing and advertising efforts to support its brand after entering into the License Agreement that are consistent with its practice before entering into the License Agreement.  Viewed in those terms, Interbake's evidence boils down to essentially two facts:  (1) the drop in expenditures from Mrs. Fields'

---

[299] *See* Restatement (Second) of Contracts § 241(b) ("the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived" relevant to whether breach is material).

[300] *See* Restatement (Second) of Contracts § 241(e) ("the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing" relevant to whether breach is material).

[301] Counterclaim ¶ 149 (Dkt. #148).

franchise advertising fund from $998,004 in 2012 to $678,002 in 2014, and (2) the firing of virtually all of Mrs. Fields' marketing department in 2014.[302]

The franchising advertising fund comes from franchise stores, which contribute a percentage of gross sales to the fund to be used to support store-level marketing efforts.[303] The amount of revenues generated for the fund and the amount spent each year out of the fund for 2010 to 2016 were as follows:

| Mrs. Fields Advertising Fund Revenues and Expenditures[304] | | |
|---|---|---|
| Year | Revenues | Expenditures |
| 2010 | $656,584 | $625,216 |
| 2011 | $707,302 | $797,014 |
| 2012 | $687,140 | $998,004 |
| 2013 | $627,277 | $738,638 |
| 2014 | $634,651 | $678,002 |
| 2015 | $674,892 | $299,333 |
| 2016 | $1,384,905 | $1,722,517 |

The average annual expenditure from the fund from 2010 to 2012, which roughly covers the period before Interbake assumed control of the retail branded

---

[302] Interbake also argues that Section 19(c) was breached because Mrs. Fields "had no idea how to maintain its brand or the difference between sales execution and brand support" and because Mrs. Fields "failed to do the normal things a brand owner does to maintain a brand during a license agreement." Def.'s Rep. Br. at 29 (Dkt. #186). Even if true, these points concern Mrs. Fields' passivity or ignorance with regard to its brand and are not probative of what it covenanted to do in Section 19(c), *i.e.*, to engage in marketing and advertising efforts "consistent with past practice."

[303] Tr. 1302-03 (Lyman) (the percentage increased over time from 1% to 3%).

[304] JX 45 at 3. Dollar figures are rounded. The figures for 2015 are for a six-month fiscal year ending June 30, 2015. *Id.* To be conservative, I assume that the figures for 2016 comprise three six-month periods.

group's operations in November 2012, is $806,745. The average annual expenditure from the fund from 2013 to 2016, which covers the period after Interbake assumed control of the retail branded groups' operations, is $859,622. Viewed from this perspective, which provides a more complete comparison of fund expenditures before and after the retail branded business was transferred to Interbake than singling out two years for comparison, expenditures from the fund increased after the License Agreement was signed.

The firing of all but one person (six out of seven) from Mrs. Fields' marketing department in 2014 is a troubling fact that weighs in Interbake's favor.[305] On the other hand, no evidence has been provided about how many people worked in the Mrs. Fields' marketing department before Interbake assumed control of the retail brand in November 2012, or about what they actually did. And the record reflects that from 2014—when the marketing department firings occurred—to 2015, Mrs. Fields increased its expenditures for "Advertising & Promotions" from $703,000 to $979,000, and increased "Catalog Expenses"—an indirect form of brand advertising—from $2.6 million to $3.1 million.[306]

---

[305] JX 1 at 45-46 (Hamilton Dep.) (estimating that six people were let go from the marketing department).

[306] JX 411 MF00032658.

Unaided by any expert opinion on the issue, and working with little more than the snippets of information discussed above, I conclude based on the totality of the evidence that Interbake has failed to demonstrate that Mrs. Fields breached its covenant to support the brand through marketing and advertising "consistent with past practice." That is not to say that the Mrs. Fields brand did not deteriorate during the license term through inattention or neglect, but only that it is more likely than not that Mrs. Fields' actual advertising and marketing efforts before and after entering into the License Agreement were consistent.[307]

\* \* \* \* \*

For the reasons explained above, Interbake was not entitled to terminate the License Agreement under Section 15(c)(iii), its purported termination under the first

---

[307] In a one-paragraph argument, Interbake asserts that if Mrs. Fields is not found to have breached Section 19(c), "it breached the implied covenant of good faith and fair dealing by failing to support the brand." Def.'s Op. Br. 33 (Dkt. # 180). It is a basic principle of Delaware law that the implied covenant "cannot be invoked where the contract itself expressly covers the subject at issue." *Allen v. El Paso Pipeline GP Co.*, 113 A.3d 167, 183 (Del. Ch. 2014) (internal quotations omitted), *judgment entered*, (Del. Ch. July 8, 2014), *aff'd*, No. 399, 2014, 2015 WL 803053 (Del. Feb. 26, 2015); *see also Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1035 (Del. Ch. 2006) ("courts should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it"). Here, the need to protect the Mrs. Fields brand was plainly foreseeable to Interbake when it negotiated the terms of the License Agreement and, indeed, the parol evidence shows that it negotiated over the language of Section 19(c) to obtain more protection than Mrs. Fields originally offered. *See* I.C (in the original version of Section 19(c), Mrs. Fields merely represented that it "will not intentionally do anything to destroy or impair its existing image.") Under these circumstances, it would be inappropriate to imply an open-ended covenant that would render essentially meaningless the one which the parties negotiated and expressly agreed on.

and third subsections of Section 15(c)(ix) were both invalid, and Mrs. Fields did not materially breach Sections 10(a), 19(c) and 19(d) of the License Agreement so as to excuse further performance by Interbake. Given Interbake's failure to establish a breach of these provisions of the License Agreement, Interbake also has failed to establish any right to recover damages.

The form of relief that will be entered is a declaration that the License Agreement was not terminated and remains in place, and the dismissal with prejudice of Counts I-III of the Counterclaim. I decline to grant Mrs. Fields an order of specific performance or a permanent injunction requiring that the License Agreement remain in place until December 31, 2017, because I see no basis for depriving Interbake of its right to terminate the License Agreement if it has a valid basis do so after the entry of judgment but before the expiration of its initial term, however remote that possibility may be.

## V. ANALYSIS OF MRS. FIELDS' REMAINING CLAIMS

Having addressed the merits of Count I of Mrs. Fields' Complaint and all the claims in Interbake's Counterclaim in the previous section, I now analyze Mrs. Fields' remaining claims in Counts II-IV of its Complaint.

### A. Mrs. Fields Has Failed to Establish a Basis for Entry of an Injunction or an Order of Specific Performance

In Count II of its Complaint, Mrs. Fields seeks an injunction to prevent Interbake from misusing or disclosing its "Protected Information" (defined below),

and an order of specific performance requiring Interbake to allow Mrs. Fields to conduct an audit under Section 7(c) of the License Agreement.[308] These issues are addressed in turn.

### 1. Mrs. Fields Has Not Proven that Its Protected Information Was Misused to Warrant Injunctive Relief

In support of its request for injunctive relief, Mrs. Fields invokes Sections 14(a), 14(c) and 15(d)(i) of the License Agreement. Section 15(d)(i) only applies upon a "cancellation, termination or expiration" of the License Agreement and thus does not apply given the conclusion reached in Section IV above that the License Agreement was not terminated and remains in place.[309]

Section 14(a) of the License Agreement contains an acknowledgement of confidentiality:

> Each party understands that any Protected Information disclosed to it by the other Party under this Agreement is secret, proprietary and of great value to the disclosing Party, which value may be impaired if the secrecy of the Protected Information is not maintained. The Party disclosing Protected Information is hereinafter sometimes referred to as the "Disclosing Party" and the Party receiving Protected Information is sometimes hereinafter referred to as the "Receiving Party".

Section 14(c) prevents the Receiving Party from disclosing Protected Information:

---

[308] Compl. ¶ 61-65 (Dkt. #135).

[309] JX 104 § 15(d) ("On any cancellation, termination or expiration of this Agreement; (i) LICENSEE . . . agrees never to use, disclose to others, nor assist in using such MRS. FIELDS Protected Information.").

Each Receiving Party agrees not to disclose the Protected Information of the Disclosing Party obtained pursuant to this Agreement, to any person or entity (other than its key officers, and employees and/or their parent and subsidiaries to whom disclosure is necessary), during the term of this Agreement or at any time following the expiration or termination of this Agreement.

The term "Protected Information" is critical to determining compliance with Section 14(c). It is defined in the License Agreement, in relevant part, as follows:

**"Protected Information"** shall mean, with respect to MRS. FIELDS, all MRS. FIELDS', and, with respect to LICENSEE, all LICENSEE'S, recipes, formulations, systems, programs, procedures, manuals, confidential reports and communications, marketing techniques and arrangements, purchasing information, pricing policies, quoting procedures, financial information, employee, customer, supplier and distributor data, all of the materials or information relating to the business or activities of such Party which were not otherwise known to the other Party prior to the commencement of negotiations leading to this Agreement, or generally known to others engaged in similar businesses or activities, and all modifications, improvements and enhancements which are derived from or relate to such other Party's access to or knowledge of any of the above enumerated materials or information . . . which such other Party receives . . . in connection with the license hereunder. Information which is independently developed by a Party . . . or information which is or becomes publicly available without breach of (i) this Agreement, (ii) any other agreement or instrument to which a Party is a party or a beneficiary, or (iii) any duty owed to one Party by the other Party, shall not be considered Protected Information of the other Party hereunder.

Three aspects of this definition are important here. The definition (1) distinguishes between Protected Information belonging to Mrs. Fields and Protected Information belonging to Interbake, (2) provides that "[i]nformation which is independently developed" by a party is its own Protected Information and not Protected

Information of the other party, and (3) generally provides that information that is "publicly available" is not "Protected Information."

Mrs. Fields asserts that Interbake disclosed its Protected Information in violation of Section 14(c). The information at issue can be grouped into three categories: (1) sales data for Mrs. Fields products; (2) packaging information and cookie samples; and (3) recipes for making the cookies.

### a. Sales Data for Mrs. Fields Products

Mrs. Fields points to various documents Interbake used internally for Project Capricorn or that it provided to Back to Nature in 2016 containing sales and pricing information for the Mrs. Fields products that Interbake sold as licensee as well as some "key insights/comments" it collected about various customers to which it sold those products.[310] Most of this information concerns 2016 pricing and sales data, and none of it pre-dates November 2012 when Interbake began operating the Mrs. Fields branded retail business. All of the information was inputted into and maintained on Interbake's own systems in the regular course of its business during Interbake's tenure as licensee, and some of it is available for purchase from public sources.[311] As such, this information was "independently developed" by and thus

---

[310] *See* JX 429, JX 522, JX 544, JX 616.

[311] Tr. 647 (Bagwell) (data in JX 522 is Nielson data available for purchase).

constitutes Protected Information of Interbake, and not Protected Information of Mrs. Fields.

Pointing to a clause in the definition of Protected Information referring to "modifications, improvements and enhancements which are derived from or relate to such other Party's access to or knowledge of any of the above enumerated materials or information," Mrs. Fields argues that the sales data Interbake disclosed to Back to Nature was Mrs. Fields' Protected Information on the theory that it was "derived from" sales data Mrs. Fields provided to Interbake during due diligence before it began serving as licensee. This argument defies common sense and ignores the key language in the clause: "modifications, improvements and enhancements." The plain meaning of that phrase logically would apply to items like cookie recipes and formulations that Mrs. Fields originally provided to Interbake, but it has no logical application to data (such as revenues and pricing information) for sales that occurred on Interbake's watch as a result of its own efforts, which Interbake recorded on its systems in the regular course of its business.

### b.      Packaging Information and Cookie Samples

Mrs. Fields contends that Interbake breached its non-disclosure obligation by sharing with Back to Nature documents containing diagrams with the dimensions of

90

cartons used to package certain Mrs. Fields products[312] and the die line for a sheet of packaging film.[313] Mrs. Fields did not submit evidence demonstrating that it provided any of this information to Interbake when it became a licensee, and anyone wishing to learn the dimensions of the cartons could do so with relative ease by purchasing a box of Mrs. Fields cookies from a store and calculating the measurements themselves.[314] Most importantly, from the face of the documents, they appear to have been created internally at Interbake or by one of its vendors after it became licensee.[315] Therefore, I find based on the preponderance of the evidence that Interbake independently developed the packaging information at issue and that this information thus constitutes Protected Information of Interbake, and not Protected Information of Mrs. Fields.

Mrs. Fields also contends that Interbake breached its non-disclosure obligations by providing Back to Nature with samples of the Mrs. Fields retail cookies it bakes. Even if this occurred, it would not constitute a breach of the

---

[312] JX 471.

[313] JX 518.

[314] Tr. 619-20 (Bagwell).

[315] The diagrams on the first two pages of JX 471 appear to have been prepared by "Interbake Foods Research and Development" (BTN000716-17), and the diagrams and information on the remaining pages appear to have been prepared by vendors (Boehmer Box or Norampac) for Interbake or Weston Foods, which are identified as the "customer" for various carton diagrams. The dates that appear throughout this document are in 2013, after Interbake became licensee. *See also* JX 518 (identifying Genpak as the printer for packaging film).

License Agreement because the cookies themselves are sold publicly as a product and do not constitute "information"—as opposed to the recipes or formulations used to make them. Indeed, food products do not fall within any of the categories listed in the definition of "Protection Information" quoted above.

I also am not convinced that Interbake actually sent samples of Mrs. Fields cookies to Back to Nature. Mrs. Fields relies on a March 4, 2016 email in which a representative of Back to Nature asked Stephanie Bagwell, Interbake's manager of contract sales, to "send us samples of different Mrs. Fields Cookies in a regular metallized package" for use at Expo West.[316] Bagwell denied sending any Mrs. Fields cookies in response to this request, explaining that the phrase "Mrs. Fields cookies" often was used as shorthand to describe soft-baked cookies generally and that she understood from the email that she was being asked to send soft-baked cookies using formulations that Interbake was developing for Back to Nature.[317] I credit this testimony, particularly given Bagwell's explanation that it would have made no sense to send actual Mrs. Fields cookies for use at Expo West, a natural foods trade show, because Mrs. Fields cookies do not have a "clean" label and thus cannot be sold as a natural food product.[318]

---

[316] JX 488 BTN000211.

[317] Tr. 610-11, 634-36, 674-75 (Bagwell).

[318] Tr. 674-75 (Bagwell).

### c. Recipes or Formulas for Mrs. Fields Cookies

Mrs. Fields' most serious contention concerning the alleged misuse of Protection Information is that Interbake shared Mrs. Fields' cookie formulas with Back to Nature for the purpose of creating replacements for Mrs. Fields products.[319] Any recipes or formulas for making the Mrs. Fields retail brand cookies that Interbake received from Mrs. Fields and any modifications or enhancements derived therefrom would be Protected Information of Mrs. Fields. The record contains no evidence, however, that Interbake actually disclosed any such recipes or formulations to Back to Nature or anyone else.

As its best evidence, Mrs. Fields points to a March 22, 2016 email from Bagwell summarizing a call between representatives of Interbake and Back to Nature referring to replacing Mrs. Fields cookies with cookies utilizing the "existing Mrs. Fields private label formulation."[320] But the email does not contain or attach any cookie recipes or formulas, and the reference to a "private label formulation" makes no sense with respect to Mrs. Fields cookies because its retail cookies were branded and not private label. As noted above, moreover, Bagwell credibly testified that the phrase "Mrs. Fields cookies" often was used as shorthand to describe soft-baked cookies generally, which would explain why the email referred to a "Mrs.

---

[319] *See* JX 465, 471, 518.

[320] JX 506 IBF00021592.

Fields *private label* formulation."[321]  The only other evidence Mrs. Fields relies on

contains recipes or formulations for ***non***-Mrs. Fields cookies or ingredients.[322]

* * * * *

For the reasons explained above, I conclude that Mrs. Fields has failed to

establish by a preponderance of the evidence that Interbake breached Section 14(c)

of the License Agreement.  Thus, Mrs. Fields is not entitled to entry of an order for

injunctive relief to enforce Section 14(c).

### 2.  Mrs. Fields Is Not Entitled to an Order of Specific Performance to Enforce Section 7(c)

Section 7(c) of the License Agreement affords Mrs. Fields the right to inspect

"relevant financial books and records" of Interbake for "review and audit" during

regular business hours upon 48 hours written notice:

> LICENSEE will make all of its relevant financial books and records available to MRS. FIELDS or its designated representative at all reasonable times for review and audit by MRS FIELDS or its designee at any time during regular business hours on not less than 48 hours prior written notice.

Mrs. Fields asks for entry of an order of specific performance based on Section 7(c).

Such a request is governed by a "clear and convincing" evidentiary standard:

> A party must prove by clear and convincing evidence that he or she is entitled to specific performance and that he or she has no adequate legal remedy.  A party seeking specific performance must establish that (1)

---

[321] *See* discussion accompanying nn. 317-18, *supra*.

[322] *See* JX 511 (Homestyle), JX 512 (Homestyle), JX 534 (ingredients).

a valid contract exists, (2) he is ready, willing, and able to perform, and (3) that the balance of equities tips in favor of the party seeking performance.[323]

Mrs. Fields' request for specific performance breaks down into two parts. First, Mrs. Fields contends that Interbake stonewalled its auditor, Paul Crystal, in connection with the inspection he conducted before this lawsuit was filed. This contention is not supported by the record. After Interbake negotiated with Crystal over the scope of his initial requests, Crystal performed an on-site audit for two days in February 2016, after which Interbake provided him with additional information in response to his requests.[324] On March 21, Crystal submitted his draft audit report to Famous Brands. Significantly, neither Crystal nor anyone else representing Mrs. Fields made any further requests for information or had any further communications with Interbake about Crystal's inspection after March 21.[325] Mrs. Fields instead opted to file this lawsuit.

In its post-trial brief, Mrs. Fields identifies three "problems requiring investigation" arising from Crystal's audit,[326] but it fails to identify any specific information Crystal requested that Interbake refused to provide except for "general

---

[323] *Osborn*, 991 A.2d at 1158.

[324] *See* I.O., *supra*.

[325] Tr. 1267-68 (Crystal).

[326] Pl's Op. Br. 58-59 (Dkt. #175) (questioning (1) whether Interbake sold Mrs. Fields products to a Canadian affiliate at below-wholesale prices, (2) the adequacy of controls for affiliated entities, and (3) sales to Big Lots in late 2013, early 2014).

ledger segments" for Norse Dairy or Colonial Cookies.[327] To the extent that Mrs. Fields is seeking access to the general ledger of *Weston Foods*, of which Interbake, Norse Dairy, and Colonial Cookies are sub-divisions,[328] Mrs. Fields is not entitled to such access because Section 7(c) only requires Interbake to make available "its" financial books and records that are "relevant" to the Mrs. Fields business. Crystal's draft audit report, moreover, indicates that he received what appears to be full access to the general ledger account and subaccounts relevant to Mrs. Fields.[329]

Second, Mrs. Fields asks for a "full audit" or "complete audit" of Interbake's records to investigate a number of alleged discrepancies concerning product sales it discovered at trial suggesting that Interbake may have "underreported royalties."[330] As just stated, Mrs. Fields is not entitled to unfettered access to all of Interbake's records because Section 7(c) specifically limits Mrs. Fields' inspection right to "its relevant financial books and records." Furthermore, the desire to investigate discrepancies arising from the trial record is essentially a new claim that was not in

---

[327] Pl.'s Op. Br. at 58 (Dkt. #175).

[328] JX 503 MF00046715.

[329] JX 503 MF00046720 (explaining that Interbake provided access to the general ledger account for Mrs. Fields (#7100) and subsegment codes (#251-258) for that account). Interbake also offered Crystal the opportunity to work with Interbake's outside auditor, KPMG, but the parties were unable to work out an arrangement for such a process, apparently because the parties could not agree on who would be responsible to pay for KPMG's fees. *Id.*; Tr. 1257-58 (Crystal).

[330] Pl's Op. Br. at 59-61 (Dkt. #175).

Mrs. Fields' Complaint, which was amended after the conclusion of fact discovery.[331] If Mrs. Fields wishes to investigate these matters, it should make a request under Section 7(c) and seek legal recourse, if necessary, after it has done so. It would be premature for the Court to attempt to adjudicate an alleged violation of Section 7(c) before Mrs. Fields has even attempted to conduct an inspection concerning these newly discovered matters.

I conclude for the reasons just explained that Mrs. Field has failed to establish by a preponderance of the evidence that Interbake breached Section 7(c) of the License Agreement. Thus, Mrs. Fields is not entitled to entry of an order of specific performance concerning Section 7(c).

### B. Mrs. Fields Has Failed to Demonstrate an Entitlement to Damages for Breach of Any Provision of the License Agreement

In Count III of its Complaint, Mrs. Fields seeks damages for alleged breaches of Sections 8, 9, 11 and 14 of the License Agreement.[332] "To prove a breach of

---

[331] *See* Compl. ¶ 64 (Dkt. #135) (Interbake "breached Section 7(c) of the License Agreement by failing to provide the material information set forth above in connection with Mrs. Fields' audit of Interbake's books and records.").

[332] Count III actually referred to Section 15(d)(i) as the basis of Mrs. Fields' damages claim for the alleged misuse of Protected Information. As explained previously, that provision only applies upon "cancellation, termination or expiration" of the License Agreement. The relevant provision governing the misuse of Protected Information "during the term" of the License Agreement is Section 14(c).

contract claim, a plaintiff must show:  the existence of a contract, the breach of an obligation imposed by that contract, and resulting damages to the plaintiff."[333]

As explained above, Mrs. Fields has failed to establish that Interbake breached Section 14(c) of the License Agreement.  I next address Mrs. Fields' damages claims with respect to Section 8, 9, and 11.

### 1. Mrs. Fields Failed to Prove a Breach of Sections 8 or 9

Section 8(a) of the License Agreement requires Interbake to sell Mrs. Fields cookies as "premium" products and to pay all costs it incurs for, among other things, marketing and packaging:

> All Royalty Bearing Products shall be developed, manufactured, marketed, and sold as "premium" products consistent with MRS. FIELDS' then existing image.  LICENSEE accepts full responsibility for and agrees to pay all costs it incurs associated with the development of all Royalty Bearing Products and all advertising and promotion, packaging design, graphics, and packaging materials for Royalty Bearing Products.

Section 9 similarly provides that Interbake "shall market Royalty Bearing Products as premium products or as is otherwise consistent with MRS. FIELDS' then existing image so that such marketing shall not reflect adversely upon Royalty Bearing Products, the good name of MRS. FIELDS, or the Licensed Names and Marks."[334]

---

[333] *In re Mobilactive Media, LLC*, 2013 WL 297950, at *14 (Del. Ch. Jan. 25, 2013) (internal quotations omitted).

[334] Mrs. Fields' claims under Sections 8 and 9 are based on the first two sentences of Section 8(a) and the first sentence of Section 9.  Post-Trial Tr. at 7-9 (Dkt. #195).

Mrs. Fields' explanation of the basis for its claim under these provisions has been an incoherent mishmash. As best I can discern, Mrs. Fields contends that Interbake violated these provisions by failing "to take steps necessary to prepare for 2016 sales of the Mrs. Fields-branded cookies" when Interbake was exploring an expanded relationship with Back to Nature as part of its backfill strategy in 2016.[335]

Section 8(a) requires Interbake to accept "full responsibility for" and "to pay" all costs it incurs "associated with the development" or the advertising and promotion of Mrs. Fields cookies, but nothing in that provision (or Section 9) obligates Interbake to advertise or promote Mrs. Fields cookies in any specific manner, to attend trade shows, to participate in trade promotions, or to redesign or repackage Mrs. Fields cookies. In fact, during the License Agreement negotiations, Mrs. Fields considered and ultimately decided against asking Interbake to agree to a provision obligating Interbake to a minimum level of "Ad/Marketing spend."[336] The License Agreement, furthermore, contains no provision that prevents Interbake from selling competing private-label cookies. To the contrary, Mrs. Fields understood and expected when it entered into the License Agreement that Interbake would continue to make and sell private-label cookies.[337]

---

[335] Pl.'s Op. Br. at 63, 66 (Dkt. #175).

[336] JX 84 MF00011120.

[337] Tr. 84-85 (Courtney).

Section 8(a) and 9 both require that Interbake market and sell Mrs. Fields'

products as a "premium" product. But Mrs. Fields has not identified any evidence

suggesting that Interbake failed to market Mrs. Fields cookies as premium products,

or marketed them in a manner inconsistent with Mrs. Fields then-existing image.

The evidence shows the opposite. Mrs. Fields approved the recipes for the cookies

that Interbake baked, and the packaging and marketing material it used to sell

them.[338] In sum, Mrs. Fields has failed to show by a preponderance of the evidence

that Interbake violated either Section 8 or 9 of the License Agreement.

### 2. Mrs. Fields Failed to Prove a Breach of Section 11 Entitling It to Damages

Mrs. Fields' explanation of its claim under Section 11 of the License

Agreement has been equally confusing and elusive. In its post-trial briefs, Mrs.

Fields focused on Section 11(b), but later conceded it does not have a claim for "an

express breach of 11(b)."[339] At post-trial argument, Mrs. Fields focused on Section

11(a), which was mentioned only in a footnote in its reply brief.

---

[338] *See, e.g.,* JX 678-684; Tr. 100-02 (Courtney); JX 14 119-20 (Courtney Dep.).

[339] Post-Trial Tr. at 14 (Dkt. #195). Section 11(b) provides that "LICENSEE recognizes the value of the goodwill associated with the Licensed Names and Marks and acknowledge [sic] that the Licensed Names and Marks and all rights therein and goodwill pertaining thereto belong exclusively to Mrs. Fields." Even if the claim had not been abandoned, no evidence has been identified that might support a breach of this provision, *e.g.*, that Interbake ever asserted that it owns any of the Licensed Names or Marks or the goodwill associated therewith.

Section 11(a) provides that:

Unless MRS. FIELDS consents in writing, which consent shall not be unreasonably withheld, LICENSEE shall use the Licensed Names and Marks:

(i)     only for the purposes of and pursuant to this Agreement,
. . .
(iii) only in the manner permitted and prescribed by MRS. FIELDS as set forth herein,

(iv) only with respect to Royalty Bearing Products, and

(v) only to market, distribute or sell Royalty Bearing Products through Designated Distribution Channels.[340]

The term "Licensed Names and Marks" is defined to "mean those trademarks, trade names and service marks identified on Exhibit E hereto."[341] That exhibit lists two names or marks registered with the U.S. Patent and Trademark Office and the Canadian Intellectual Property Office, and two pending applications.

In a footnote of its reply brief, Mrs. Fields contends that Interbake breached Section 11(a) by (1) telling Delhaize in January 2016 that it could provide "Premium Cookies – i.e., Mrs. Fields type cookies,"[342] and (2) using the Mrs. Fields logo in its April 2016 Back to Nature kick-off-call slide-deck.[343] As to the first contention,

---

[340] Mrs. Fields bases its claim under Section 11(a) on subparts (i) and (iii)-(v) of that provision.  Post-Trial Tr. at 11-12 (Dkt. #195).

[341] JX 104 at 3.

[342] JX 427 at 5.

[343] Pl.'s Ans. Br. at 21 n. 14 (Dkt. #183).

Interbake's generic reference to "Mrs. Fields type cookies" as a shorthand descriptor for premium cookies does not constitute a use of the Licensed Names and Marks in my opinion. Nor has Mrs. Fields demonstrated how it has been damaged in any way by Interbake's use of this phrase.

As to the second contention, the Mrs. Fields' logo used in the Back to Nature slide deck (JX 616) appears to display a registered trademark symbol: ®. Interbake's use of the logo in the slide deck thus violated Section 11(a) in my opinion because the logo was not being used to "market, distribute or sell Royalty Bearing Products through Designated Distribution Channels" as Section 11(a) requires, but instead was used to pitch a potential roll-out of private-label products with Back to Nature, which ultimately was not pursued.[344] Although Mrs. Fields has proven a breach of Section 11(a), it provided no evidence that it suffered any damages as a result of this breach.[345]

---

[344] *See* JX 616. The record does not contain actual evidence that the logo used in JX 616 is on Schedule E of the License Agreement, but it would be reasonable to infer that it is.

[345] The damages analysis Mrs. Fields submitted at trial is totally disconnected from the breach of any particular provision of the License Agreement. Instead, working from the vague assumption that "Interbake is found liable" for some unidentified "breach of contract," Mrs. Fields' damages expert, Weston Anson, purported to calculate the difference between the value of the Mrs. Fields retail cookie business between (1) July 1, 2015, when Anson had "seen evidence" that Interbake intended "to leave the license," and (2) September 16, 2016, the date of his report. Tr. 1330-33 (Anson). Based on various assumptions and methodologies, Anson pegged the damages at an astounding $28.7 million—more than fourteen times the minimum annual royalty under the License Agreement. There are many flaws in Anson's analysis, not the least of which was his failure to consider anything that Mrs. Fields—the owner of the brand—did or did not do

For the reasons explained above, I conclude that Mrs. Field has failed to prove any entitlement to recover damages under Sections 8, 9, 11 or 14 of the License Agreement.

## C.    Mrs. Fields' Implied Covenant Claim Is Not Ripe for Review

In Count IV of its Complaint, Mrs. Fields asserts that Interbake breached the implied covenant of good faith and fair dealing. Mrs. Fields advances this claim in the alternative to Count III if Interbake's "actions between May 2015 and May 2016" did not breach the express terms of the License Agreement.[346]

The covenant is "a way of implying terms in the agreement, whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions," that requires the parties to a contract to act reasonably and in a manner that does not frustrate the contract's underlying purpose:

> Stated in its most general terms, the implied covenant requires "a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits" of the bargain. Thus, parties are liable for breaching the covenant when their conduct frustrates the

---

during the term of the license (such as failing to invest in a refreshment of its brand) that may have caused or at least have contributed to a decline in the value of the business Interbake operated as a licensee. Tr. 1373 (Anson). Given my conclusion that Mrs. Fields failed to prove a breach of any provision of the License Agreement except for Section 11(a), for which Mrs. Fields failed to establish any resulting damages, it is unnecessary to address Anson's opinions further.

[346] Pl.'s Op. Br. at 67 (Dkt. #175).

"overarching purpose" of the contract by taking advantage of their position to control implementation of the agreement's terms.[347]

"Delaware's implied duty of good faith and fair dealing is not an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not, that later adversely affected one party to a contract. Rather the covenant is a limited and extraordinary legal remedy."[348]  The covenant does not save a party to an agreement from regret or negligent drafting, and Delaware courts will not rewrite contractual language "just because one party failed to extract as complete a range of protections as it, after the fact, claims to have desired during the negotiation process."[349] It applies instead only "to developments that could not be anticipated, not developments that the parties simply failed to consider."[350]

Mrs. Fields argues that a "fundamental premise and expectation of the [License] Agreement was that the licensed business . . . would continue to be a viable revenue-generating business after the Agreement was over" and thus Interbake had "an implied obligation to provide reasonable cooperation with [Mrs. Fields] (or its

---

[347] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) (internal quotations omitted).

[348] *Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010).

[349] *GC-Sun Holdings, L.P.*, 910 A.2d at 1033.

[350] *Nemec*, 991 A.2d at 1126.

designee, such as a new licensee) as the Agreement was coming to an end, in order to facilitate a smooth transition of the business."[351]

Interbake counters that Mrs. Fields knew during the License Agreement negotiations that "the Agreement was of limited duration and could come to an end" and thus it should not be permitted to rewrite the License Agreement to include provisions it could have but failed to request during the negotiations, such as provisions requiring that Interbake "ensure a smooth transition" or "return a business viewed as 'viable' in [Mrs. Fields'] eyes."[352] Interbake also points out that the License Agreement contains a number of provisions addressing the parties' respective rights upon its termination or cancellation,[353] that it expressly provides for a $2 million minimum annual royalty to protect Mrs. Fields, and that the parties agreed to delete from the License Agreement any obligation for Interbake to achieve a minimum amount of annual sales. According to Interbake, to imply "a requirement to return a 'viable' business of a certain sales level would improperly contradict the express provisions of the [License] Agreement and the intent gleaned from the parties' negotiations."[354]

---

[351] Pl.'s Op. Br. at 67 (Dkt. #175).

[352] Def.'s Rep. Br. at 56 (Dkt. #186).

[353] *See* JX 104 §§ 15(d), 15(e), 16, 17.

[354] Def.'s Rep. Br. at 58.

In my opinion, it would be premature and ill-considered to attempt to adjudicate Mrs. Fields' implied covenant claim because the License Agreement has not been terminated and remains in place for all the reasons discussed previously. Indeed, Interbake has continued to serve as licensee during the pendency of this litigation under the Standstill Order. To wade into issues of transition before the transition actually has happened would amount to the rendering of an advisory opinion.[355] Accordingly, Count IV will be dismissed without prejudice for lack of ripeness.

## VI. CONCLUSION

For the foregoing reasons, Mrs. Fields is entitled to a declaratory judgment that the License Agreement was not terminated and remains in place. Judgment will be entered in Mrs. Fields' favor on Count I of its Complaint and Counts I-III of Interbake's Counterclaim, and in Interbake's favor on Counts II-III of Mrs. Fields' Complaint. Count IV of the Complaint will be dismissed without prejudice.

Both parties sought an award of attorneys' fees and expenses under Section 22(j) of the License Agreement, which entitles the "Party prevailing . . . to reimbursement of its reasonable costs and expenses." But neither party briefed the

---

[355] *See XI Specialty Ins. Co. v. WMI Liquidating Trust*, 93 A.3d 1208, 1217 (Del. 2014) ("Delaware courts do not render advisory or hypothetical opinions.").

issue. The parties are directed to confer and to submit to the Court within five business days (1) a proposed schedule for briefing the fee and expense issue, and (2) a form of final judgment. Opening and answer briefs on the fee and expense issue shall not exceed 3,000 words, with any reply not to exceed 2,000 words.

The net result of this overly lengthy opinion is that the License Agreement remains in place, and that about six months remain on its initial term, which expires on December 31, 2017. According to Mrs. Fields' own expert, that is a common period of time to transition a business in the consumer packaged goods industry.[356] Indeed, that period is roughly equivalent to the amount of time it took for Mrs. Fields to transition the business from Shadewell to itself, and from itself to Interbake. The Court strongly encourages the parties to refrain from further unproductive litigation, and to use the time that remains on the initial term of the License Agreement to work together in a reasonable way to effectuate the transition in a business-like manner.

**IT IS SO ORDERED.**

---

[356] Tr. 1382-83 (Anson).

107